**EFFECTS ASSOCIATES, INC.,**
Plaintiff–counter–defendant–Appellant,

v.

**Larry COHEN; Larco Productions, Inc.; New World Entertainment,**
Defendants–counter–claimants–Appellees.

No. 88–6455.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 7, 1990.

Decided July 20, 1990.

John Blair Overton, Sausalito, Cal., for plaintiff-counter-defendant-appellant.

Vincent Cox, Leopold, Petrich & Smith, Los Angeles, Cal., for defendants-counter-claimants-appellees.

Before CANBY, KOZINSKI and LEAVY, Circuit Judges.

KOZINSKI, Circuit Judge:

What we have here is a failure to compensate. Larry Cohen, a low-budget horror movie mogul, paid less than the agreed price for special effects footage he had commissioned from Effects Associates. Cohen then used this footage without first obtaining a written license or assignment of the copyright; Effects sued for copyright infringement. We consider whether a transfer of copyright without a written agreement, an arrangement apparently not uncommon in the motion picture industry, conforms with the requirements of the Copyright Act.

### Facts

This started out as a run-of-the-mill Hollywood squabble. Defendant Larry Cohen wrote, directed and executive produced "The Stuff," a horror movie with a dash of social satire: Earth is invaded by an alien

life form that looks (and tastes) like frozen yogurt but, alas, has some unfortunate side effects—it's addictive and takes over the mind of anyone who eats it. Marketed by an unscrupulous entrepreneur, the Stuff becomes a big hit. An industrial spy hired by ice cream manufacturers eventually uncovers the terrible truth; he alerts the American people and blows up the yogurt factory, making the world safe once again for lovers of frozen confections.

In cooking up this gustatory melodrama, Cohen asked Effects Associates, a small special effects company, to create footage to enhance certain action sequences in the film. In a short letter dated October 29, 1984, Effects offered to prepare seven shots,[1] the most dramatic of which would depict the climactic explosion of the Stuff factory. Cohen agreed to the deal orally, but no one said anything about who would own the copyright in the footage.

Cohen was unhappy with the factory explosion Effects created, and he expressed his dissatisfaction by paying Effects only half the promised amount for that shot. Effects made several demands for the rest of the money (a little over $8,000), but Cohen refused. Nevertheless, Cohen incorporated Effects's footage into the film and turned it over to New World Entertainment for distribution. Effects then brought this copyright infringement action, claiming that Cohen (along with his production company and New World) had no right to use the special effects footage unless he paid Effects the full contract price. Effects also brought pendent state law claims for fraud and conspiracy to infringe copyright.

The district court initially dismissed the suit, holding that it was primarily a contract dispute and, as such, did not arise under federal law. In an opinion remarkable for its lucidity, we reversed and remanded, concluding that plaintiff was "master of his claim" and could opt to pursue the copyright infringement action instead of suing on the contract. *Effects Assocs., Inc. v. Cohen*, 817 F.2d 72, 73 (9th Cir.1987). We recognized that the issue on remand would be whether Effects had transferred to Cohen the right to use the footage. *Id.* at 73 & n. 1, 74.

On remand, the district court granted summary judgment to Cohen on the infringement claim, holding that Effects had granted Cohen an implied license to use the shots. Accordingly, the court dismissed the remaining state law claims, allowing Effects to pursue them in state court. We review the district court's grant of summary judgment de novo.

### Discussion

#### A. Transfer of Copyright Ownership

■ The law couldn't be clearer: The copyright owner of "a motion picture or other audiovisual work" has the exclusive rights to copy, distribute or display the copyrighted work publicly. 17 U.S.C. § 106 (1988). While the copyright owner can sell or license his rights to someone else, section 204 of the Copyright Act invalidates a purported transfer of ownership unless it is in writing. 17 U.S.C. § 204(a) (1988).[2] Here, no one disputes that Effects is the copyright owner of the special effects footage used in "The Stuff,"[3] and that defendants copied, distributed and publicly displayed this footage without written authorization.

Cohen suggests that section 204's writing requirement does not apply to this situation, advancing an argument that might be summarized, tongue in cheek, as: Moviemakers do lunch, not contracts. Cohen concedes that "[i]n the best of all possible legal worlds" parties would obey the writing requirement, but contends that movie-

---

**1.** The price originally agreed to was $62,335; in an invoice dated January 10, 1985, Effects adjusted this amount upward to $64,033.92, because of additional expenses incurred in creating the shots.

**2.** The Copyright Act defines "transfer of copyright ownership" as an "assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright ... but not including a nonexclusive license." 17 U.S.C. § 101.

**3.** Cohen concedes that he licensed Effects to prepare the footage as a derivative work incorporating other shots from "The Stuff," and that Effects has a valid copyright in this footage. Appellees' Brief at 25 n. 3.

makers are too absorbed in developing "joint creative endeavors" to "focus upon the legal niceties of copyright licenses." Appellees' Brief at 16, 18. Thus, Cohen suggests that we hold section 204's writing requirement inapplicable here because "it [i]s customary in the motion picture industry ... not to have written licenses." *Id.* at 18. To the extent that Cohen's argument amounts to a plea to exempt moviemakers from the normal operation of section 204 by making implied transfers of copyrights "the rule, not the exception," *id.*, we reject his argument.

Common sense tells us that agreements should routinely be put in writing. This simple practice prevents misunderstandings by spelling out the terms of a deal in black and white, forces parties to clarify their thinking and consider problems that could potentially arise, and encourages them to take their promises seriously because it's harder to backtrack on a written contract than on an oral one. Copyright law dovetails nicely with common sense by requiring that a transfer of copyright ownership be in writing. Section 204 ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price. *Cf. Community for Creative Non-Violence v. Reid,* — U.S. ——, 109 S.Ct. 2166, 2177–78, 104 L.Ed.2d 811 (1989) (describing purpose of writing requirement for works made for hire). Most importantly, section 204 enhances predictability and certainty of copyright ownership—"Congress' paramount goal" when it revised the Act in 1976. *Community for Creative Non-Violence,* 109 S.Ct. at 2177; *see also Dumas v. Gommerman,* 865 F.2d 1093, 1103–04 (9th Cir.1989). Rather than look to the courts every time they disagree as to whether a particular use of the work violates their mutual understanding, parties need only look to the writing that sets out their respective rights.

Section 204's writing requirement is not unduly burdensome; it necessitates neither protracted negotiations nor substantial expense. The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do.

Cohen's attempt to exempt moviemakers from the requirements of the Copyright Act is largely precluded by recent Supreme Court and circuit authority construing the work-for-hire doctrine.[4] Section 101 of the Act defines, in relevant part, a work made for hire as "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101 (1988). Section 201(b) provides that the copyright in such a work is presumed to vest in the employer, not the employee. 17 U.S.C. § 201(b) (1988). Prior to the Supreme Court's decision in *Community for Creative Non-Violence,* some circuits had broadly construed section 101's use of the term employee, holding a work to have been prepared by an employee whenever the hiring party controlled, or had the right to control, the product. *See Community for Creative Non-Violence,* 109 S.Ct. at 2172. This broad definition encompassed virtually all contributions to books and movies because, as the Court recognized, such contributions are "usually prepared at the instance, direction, and risk of a publisher or producer." *Id.* at 2173. The Court rejected this rule as inconsistent with both the language and purpose of the Copyright Act. *Id.* at 2172–74, 2177–78. It held instead that the term employee was to be defined according to general agency principles, *id.* at 2173, 2178; where a non-employee contributes to a book or movie, as Effects did here, the exclusive rights of copyright ownership vest in the creator of the contribution, unless there is a written agreement to the contrary. *See id.* at 2173.

This is similar to the conclusion we had reached several months earlier in *Dumas v.*

---

4. Because Effects is not an employee and there is no written agreement stating that plaintiff's footage is a work made for hire, Cohen can't take advantage of this doctrine. *See* pp. 556– 557 *supra.* In any event, Cohen has waived this argument by failing to raise it below. *See S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1087 (9th Cir.1989).

*Gommerman.* We had reasoned that, while many individuals may contribute to the final product, the Act does no more than give publishers and producers "statutory *permission* " to contract with the various contributors for the rights of authorship. 865 F.2d at 1101 (quoting *Easter Seal Soc'y v. Playboy Enters.*, 815 F.2d 323, 329 (5th Cir.1987), *cert. denied* 485 U.S. 981, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988) (emphasis original)). Absent an express transfer of ownership, a contributor who is not an employee retains ownership of his copyright. *See id.*

Thus, section 101 specifically addresses the movie and book publishing industries, affording moviemakers a simple, straightforward way of obtaining ownership of the copyright in a creative contribution—namely, a written agreement. The Supreme Court and this circuit, while recognizing the custom and practice in the industry, have refused to permit moviemakers to sidestep section 204's writing requirement. Accordingly, we find unpersuasive Cohen's contention that section 204's writing requirement, which singles out no particular group, somehow doesn't apply to him. As section 204 makes no special allowances for the movie industry, neither do we.

### B. Nonexclusive Licenses

█ Although we reject any suggestion that moviemakers are immune to section 204, we note that there is a narrow exception to the writing requirement that may apply here. Section 204 provides that all transfers of copyright ownership must be in writing; section 101 defines transfers of ownership broadly, but expressly removes from the scope of section 204 a "nonexclusive license." *See* note 2 *supra*. The sole issue that remains, then, is whether Cohen had a nonexclusive license to use plaintiff's special effects footage.

█ The leading treatise on copyright law states that "[a] nonexclusive license

may be granted orally, or may even be implied from conduct." 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 10.03[A], at 10–36 (1989). Cohen relies on the latter proposition; he insists that, although Effects never gave him a written or oral license, Effects's conduct created an implied license to use the footage in "The Stuff."

Cohen relies largely on our decision in *Oddo v. Ries,* 743 F.2d 630 (9th Cir.1984). There, we held that Oddo, the author of a series of articles on how to restore Ford F–100 pickup trucks, had impliedly granted a limited non-exclusive license to Ries, a publisher, to use plaintiff's articles in a book on the same topic. We relied on the fact that Oddo and Ries had formed a partnership to create and publish the book, with Oddo writing and Ries providing capital. *Id.* at 632 & n. 1. Oddo prepared a manuscript consisting partly of material taken from his prior articles and submitted it to Ries. *Id.* at 632. Because the manuscript incorporated pre-existing material, it was a derivative work; by publishing it, Ries would have necessarily infringed the copyright in Oddo's articles, unless Oddo had granted him a license. *Id.* at 634. We concluded that, in preparing and handing over to Ries a manuscript intended for publication that, if published, would infringe Oddo's copyright, Oddo "impliedly gave the partnership a license to use the articles insofar as they were incorporated in the manuscript, for without such a license, Oddo's contribution to the partnership venture would have been of minimal value." *Id.*[5]

█ The district court agreed with Cohen, and we agree with the district court: *Oddo* controls here. Like the plaintiff in *Oddo,* Effects created a work at defendant's request and handed it over, intending that defendant copy and distribute it.[6]

---

**5.** Oddo did nevertheless prevail, but on other grounds. Ries was unhappy with Oddo's manuscript and hired another writer to do the job right. This writer added much new material, but also used large chunks of Oddo's manuscript, thereby incorporating portions of Oddo's pre-existing articles. 743 F.2d at 632. By publishing the other writer's book, Ries exceeded

the scope of his implied license to use Oddo's articles and was liable for copyright infringement. *Id.* at 634.

**6.** As the district court found, "every objective fact concerning the transaction at issue supports a finding that an implied license existed." Or-

To hold that Effects did not at the same time convey a license to use the footage in "The Stuff" would mean that plaintiff's contribution to the film was "of minimal value," a conclusion that can't be squared with the fact that Cohen paid Effects almost $56,000 for this footage. Accordingly, we conclude that Effects impliedly granted nonexclusive licenses to Cohen and his production company to incorporate the special effects footage into "The Stuff" and to New World Entertainment to distribute the film.[7]

### Conclusion

We affirm the district court's grant of summary judgment in favor of Cohen and the other defendants. We note, however, that plaintiff doesn't leave this court empty-handed. Copyright ownership is comprised of a bundle of rights; in granting a nonexclusive license to Cohen, Effects has given up only one stick from that bundle— the right to sue Cohen for copyright infringement. It retains the right to sue him in state court on a variety of other grounds, including breach of contract. Additionally, Effects may license, sell or give away for nothing its remaining rights in the special effects footage. Those rights may not be particularly valuable, of course: "The Stuff" was something less than a blockbuster, and it remains to be seen whether there's a market for shots featur-

ing great gobs of alien yogurt oozing out of a defunct factory. On the other hand, the shots may have much potential for use in music videos. *See generally* Kozinski & Banner, *Who's Afraid of Commercial Speech?*, 76 Va.L.Rev. 627, 641 (1990). In any event, whatever Effects chooses to do with the footage, Cohen will have no basis for complaining. And that's an important lesson that licensees of more versatile film properties may want to take to heart.

---

der Granting Summary Judgment (Aug. 26, 1988) at 2. Effects's copyright registration certificate states that the footage is to be used in "The Stuff," so does the letter agreement of October 29, 1984, and Effects's President James Danforth agreed at his deposition that this was his understanding. CR 24 at 11. Also, Effects delivered the film negatives to Cohen, never warning him that cutting the negatives into the film would constitute copyright infringement. CR 24 at 29. While delivery of a copy "does not *of itself* convey any rights in the copyrighted work," 17 U.S.C. § 202 (1988) (emphasis added), it is one factor that may be relied upon in determining that an implied license has been granted.

7. Plaintiff argues that an implied license is an equitable remedy, akin to estoppel, for which Cohen does not qualify because he hasn't paid in full the agreed-to price for the footage. We reject this argument. Plaintiff cites no authority for the proposition that an implied license is

equitable in nature; it seems to us to be a creature of law, much like any other implied-in-fact contract. *See, e.g., Landsberg v. Scrabble Crossword Game Players, Inc.*, 802 F.2d 1193, 1199 (9th Cir.1986). In any event, it is unclear that a balancing of equities would favor plaintiff, who has been paid almost $56,000 for footage that is worthless to Cohen should plaintiff prevail.

Nor can we construe payment in full as a condition precedent to implying a license. Conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language. *Sulmeyer v. United States (In re Bubble Up Delaware, Inc.)*, 684 F.2d 1259, 1264 (9th Cir.1982). The language of the October 29, 1984, agreement doesn't support a conclusion that full payment was a condition precedent to Cohen's use of the footage. Moreover, Effects's president conceded at his deposition that he never told Cohen that a failure to pay would be viewed as copyright infringement. CR 24 at 29.