**I.A.E., INCORPORATED and Rama Talluri, Plaintiffs–Appellees,**

v.

**Paul D. SHAVER, Defendant–Third/Party Plaintiff–Appellant,**

v.

**H. Seay CANTRELL, doing business as H. Seay Cantrell & Associates, William Brewer, doing business as BEMI Construction, Incorporated and Gary Regional Airport Authority, Third/Party Defendants–Appellees.**

No. 95–2220.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 25, 1995.

Decided Jan. 17, 1996.

Saul I. Ruman, William H. Tobin (argued), Linda R. Rietveld, Ruman, Clements, Tobin & Holub, Hammond, IN, for I.A.E., Inc., Rama Talluri, H. Seay Cantrell, William Brewer.

Werner Sabo (argued), James Christopher Adamson, Sabo & Zahn, Chicago, IL, for Paul D. Shaver.

Phyllis J. Senegal (argued), Gary, IN, for Gary Regional Airport Authority.

Before CUMMINGS, COFFEY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Architect Paul D. Shaver appeals the district court's summary judgment ruling that there was no infringement of Mr. Shaver's copyrighted schematic design drawings. The court concluded that Mr. Shaver had granted an implied nonexclusive license to utilize his drawings in the completion of Gary Regional Airport's air cargo building. For the reasons that follow, we affirm the judgment of the district court.

## I

## BACKGROUND

### A. *Facts*

In July 1992, two construction companies formed a joint venture. I.A.E., Inc. and its president Ramamurty Talluri joined with BEMI Construction and its president William Brewer to become the I.A.E./BEMI Joint Venture ("Joint Venture"). On December 21, 1992, the Joint Venture entered into a contract with the Gary Regional Airport Authority ("Airport") to design and to construct an air cargo/hangar building. Under the contract, Joint Venture was to provide all of the civil, structural, mechanical and electrical engineering services and architectural design services needed to construct the air cargo building.

In furtherance of that goal, Joint Venture subcontracted with Paul D. Shaver, an architect with extensive experience in designing airport facilities, to prepare the schematic design drawings for the airport building. The parties agree that there are four phases to the architectural design of a building: schematic design, preliminary design, final design and construction supervision. The schematic design documents are the product of the first phase of designing a building. They outline the scope of the project and are the basis of the owner's approval for the building design. Schematic design documents are often used as a reference base for further design development.

Mr. Shaver's letter of January 14, 1993, to Mr. Talluri, which constitutes the written contract between the architect and Joint Venture, contained Mr. Shaver's agreement to prepare the schematic design drawings for the Airport building: "With the assistance of your office and the [Airport] staff, agreed design parameters can be established initially to permit the Project to proceed in a normal development manner." R. 43, Ex. 3. The contract price for his services was $10,000 plus reimbursable expenses, less deductions for the participation of I.A.E.'s staff. The contract specifically set forth the services Mr. Shaver intended to perform:

> To prepare, with the assistance of your office and BEMI, Inc., staff, standard Design Documents (15%–19% of the total design work), which would describe the agreed scope of the Project, we estimate a 4–5 week period of time including two or three scheduled approval meetings with your office and [Airport] Authority personnel. These documents would consist of the following which are customarily prepared to describe the scope of the Project and also for general reference:
>
> > Drawings, 5, Title Sheet, Site Plan, Floor Plans, Elevations and Building Sections Preliminary Construction Cost Estimate
>
> \* \* \* \* \* \*

[W]e are prepared to complete the required Schematic Design Document preparation for $10,000 subject to adjustment with deductions resulting from partic-

ipation of staff from your office and your Architectural associate.

\* \* \* \* \* \*

... Please advise us if you need any additional data concerning our understanding of the scope of work.

R. 43, Ex. 3. Mr. Shaver believed that, once a design had been approved, he would execute further written contracts for the remaining phases of the architectural work.

After Mr. Shaver attended several meetings with the Airport, he prepared his schematic design drawings of the proposed Airport building. He then delivered copies of his schematic drawings to the Airport, Joint Venture, and other parties involved in the Project. These drawings were submitted with a notice of copyright. The copyrights of those drawings, both as technical drawings and as architectural works, were effective June 2, 1993. Their validity has not been challenged. Mr. Shaver and Mr. Talluri later presented to the Airport the completed schematic designs. On February 22, 1993, the Airport approved one of them. Mr. Shaver was paid $5,000 of his fee on that date.

On March 1, 1993, Joint Venture retained H. Seay Cantrell & Associates ("Cantrell") to perform the remaining architectural work for the air cargo building. When Mr. Shaver realized that he and his firm were no longer involved in the Project, he took two actions. On March 3, 1993, Mr. Shaver wrote to the Airport's Executive Director, Levelle Gatewood, acknowledging that he and his staff were, "under the circumstances, no longer in a position to participate or contribute to the development of the east Air Cargo Building Project." R. 54. The letter, with enclosed copies of Mr. Shaver's schematic design drawings, also stated:

> We trust that our ideas and knowledge exhibited in our work will assist the Airport in realizing a credible and flexible use Cargo/Hangar facility.

R. 54.

Mr. Shaver's second act, one week later, was to seek collection of the amount that Joint Venture still owed him for the services he had rendered and to notify Joint Venture that he intended to enforce his copyrights if necessary. Mr. Shaver, by his attorney, claimed that he was owed an additional $5,000 fee, plus his out-of-pocket expenses ($887.29), plus (a new claim) a $7,000 payment for the purported "assignment" of his copyright on the schematic design documents. The attorney's letter of March 10, 1993 offered Mr. Talluri a settlement of Mr. Shaver's claim against Joint Venture for $12,887.29.[1] Mr. Talluri agreed to pay the contract costs, $5,887.29, as final payment. According to Mr. Talluri, Mr. Shaver "had never previously raised the issue of copyright, copyright infringement or his alleged entitlement to moneys, in addition to the contract amount, for 'assignment' of his copyright on the schematic design drawings." R. 48.

Once it was clear that Mr. Shaver and Joint Venture would not reach an accord concerning any amount still owing to Mr. Shaver under the contract, on August 5, 1993, I.A.E. and Mr. Talluri filed this action. They sought a declaratory judgment that they did not infringe any copyrights owned by Mr. Shaver and that they had a right to use Mr. Shaver's drawings; they also sought damages. Mr. Shaver counterclaimed against I.A.E. and Mr. Talluri, seeking damages for copyright infringement and breach

---

1. The settlement offer presented the following conditions:

 1. Payment by you in the amount of $12,-887.29. This is broken down as follows:

 | | |
 |---|---|
 | payment due | $5,000.00 |
 | reimbursibles | 887.29 |
 | assignment of copyright | 7,000.00 |

 2. Acknowledgment of Mr. Shaver as "Associated Architect," including this somewhere in the title block of the drawings, and giving Mr. Shaver the right to use this acknowledgement in his promotional literature.

 3. After receipt of the above, Mr. Shaver would not have any further involvement in this particular project.

 Please call me if you are willing to accept this offer. If you are not, I would remind you that Mr. Shaver's drawings are copyrighted and cannot be used in any manner inconsistent with the United States Copyright laws.

 R. 43, Ex. 6. In its complaint, Joint Venture explicitly does not dispute its liability for the amount due under the contract.

of contract. He also filed third-party complaints against Cantrell, BEMI and its president Mr. Brewer, and the Airport, alleging that all the named defendants had infringed his copyrights in the schematic design documents or that they had conspired to do so by copying and using elements of his design in the final bid documents for the Airport Project. Joint Venture and the Airport responded that they had used Mr. Shaver's drawings only as Mr. Shaver had intended their use, to build the Airport's air cargo building. All parties then filed cross-motions for summary judgment.

## B. Decision of the District Court

The district court focused on what it termed the "heart of the dispute"—whether Mr. Shaver has a valid claim of copyright infringement. The court noted that a copyright owner may sell or license his ownership rights only in writing. However, a "nonexclusive license" in a copyrighted work may be given either "orally, or ... by law to effect the intent demonstrated by the parties' conduct." R. 78 at 8. It then determined that the facts in this case are very similar to those in *Effects Associates, Inc. v. Cohen,* 908 F.2d 555 (9th Cir.1990), *cert. denied,* 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991). Just as the plaintiff in *Effects* "created a work at defendant's request and handed it over, intending that defendant copy and distribute it," in exchange for $56,000, *id.* at 558, Mr. Shaver created, for a fee of $10,000, designs for the Airport's air cargo building and handed them over to Joint Venture and the Airport. The court noted that Mr. Shaver contracted to prepare standard design documents that would describe the scope of the Project. In a later letter, Mr. Shaver acknowledged that he would no longer be contributing to the development of the building, but trusted that his ideas, as incorporated in his drawings, would help the Airport to realize its air cargo building. The district court concluded that, just as the Ninth Circuit had found in *Effects* that the plaintiff had conveyed an implied nonexclusive license to the defendant to use its work, *id.* at 559, Mr.

Shaver's January 14, 1993 letter contract created an implied nonexclusive license allowing the Airport to use Mr. Shaver's drawings when constructing the air cargo building:

> As a matter of law, only one conclusion can be drawn from these undisputed facts: Shaver granted the Airport a nonexclusive license to use his drawings as the basis for preparing working drawings and completing the project. Shaver's argument that the Airport can use the drawings only as pieces of paper (wallhangings? placemats?) is untenable.

R. 78 at 10.

The court further concluded that Mr. Shaver's contract was not ambiguous, and thus did not need clarification through extrinsic evidence of "practice and custom in the industry."[2] R. 78 at 12. Nevertheless, the court addressed Mr. Shaver's evidence that the standard contract of the American Institute of Architects (AIA) expressly provides that drawings remain the property of the architect and are not to be used by the owner for completion of the Project. The court noted that the architect could have used the AIA contract, but did not. It concluded that Mr. Shaver's choice not to utilize that contract "does not create an issue of fact as to the parties' intent to allow the Airport to utilize his design." R. 78 at 15. In any event, commented the court, the very need for a contractual provision raised not the inference of the existence of a custom, but the inference that no custom or the opposite custom existed. The court also rejected Mr. Shaver's argument that he later revoked any implied nonexclusive license he may have granted; it followed the position of *Nimmer on Copyright* that "when, as here, consideration is paid for a license, it is irrevocable." R. 78 at 16, citing Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright* §§ 10.01[C][5], 10.02[B][5] (1995) (*"Nimmer"*). The court concluded that, because Mr. Shaver did not use the AIA contract to prohibit use of the drawings to complete the Project absent his involvement or permission, he must now abide by the bargain he made. *Id.*

---

**2.** The court noted that the parties did not suggest which state law should govern Mr. Shaver's contract; nor do they discuss the issue on appeal. (A solitary reference to Indiana's statute regulat-ing architects is not sufficient.) Just as the district court assumed that Indiana law should apply to the contract before it, R. 78 at 12 n. 9, so do we.

The court accordingly denied Mr. Shaver's motion for summary judgment and granted the summary judgment motions of Talluri, I.A.E., BEMI, Brewer, Cantrell, Joint Venture and the Airport. It entered final judgment dismissing with prejudice Mr. Shaver's claims for damages. It declared that there was no infringement on Mr. Shaver's copyrights of his architectural designs and that the Joint Venture principals, the Airport and Cantrell had implied nonexclusive licenses to use Mr. Shaver's copyrighted works to complete the air cargo building. Finally, the court dismissed without prejudice all remaining state law claims.

## C. Contentions of the Parties

Mr. Shaver first submits that "an implied license to use an architect's copyrighted works could only exist where the architect intends for there to be such a license." Appellant's Br. at 12. Because he never intended to grant the Airport a license to use his copyrighted schematic design drawings, he continues, the district court's finding of an implied nonexclusive license is error as a matter of law.[3]

In the present case, the District Court was correct when it held that Shaver anticipated that his copyrighted drawings would be used to complete the building, albeit with Shaver as the architect who would be preparing the final drawings to be used for the construction. However, the court erred by assuming that Shaver intended to allow the Joint Venture to use the drawings in any way that it wished to accomplish this result.... Because the Shaver–Joint Venture contract was silent on how the Airport was allowed to use the drawings, the District Court should have assumed that Shaver intended for the Airport to use the Schematic Design Drawings in a way that best protected his copyright and allowed for the completion of the cargo hangar building.

Appellant's Br. at 19.

Mr. Shaver also urges us to view a nonexclusive license narrowly by rejecting any implied license and by requiring instead that a nonexclusive license be an express oral agreement. In this case, he contends, there was no license given, written or oral, and the district court was wrong to imply a nonexclusive license. In furtherance of his position, Mr. Shaver submits that the Copyright Act disfavors such an implication:

The only logical interpretation of the Copyright Act is to not allow the architect to be removed from a project without also allowing that architect to fully enforce all of his copyrights. This means no "implied licenses." If the parties want a licensing agreement, they should express their intention, preferably in writing.

Appellant's Br. at 32.

Mr. Shaver, then assuming arguendo that Joint Venture had a license, contends that Joint Venture exceeded the scope of the license when it engaged Cantrell to use Mr. Shaver's drawings, gave the drawings to the Airport, and allowed a building to be constructed based on Mr. Shaver's design. Mr. Shaver further posits that the Airport and Cantrell lost any license they may have had by not paying the license fee he demanded; Joint Venture similarly lost any implied license it may have had by paying Mr. Shaver only half his fee.

Arguing in the alternative, Mr. Shaver also submits (minimally in his brief, but at length at oral argument) that the license found in the January 14, 1993 contract was actually an *exclusive* license to complete the specific air cargo building being designed for the Airport, only one of which could be built at that site. Because the contract did not contain an express written licensing agreement, Mr. Shaver submits that the Airport had no license to use Mr. Shaver's drawings. In fact, because all designs must be site-specific, Mr. Shaver's attorney contended at oral argument that, in architecture, there can be no nonexclusive licenses.

---

**3.** Mr. Shaver explained that his intent is reflected in his plan to use the American Institute of Architecture form contract that forbids the use of architectural drawings without the architect's approval. Although Mr. Shaver did not use that contract, he claimed that his intent is nevertheless a question of fact that defeats summary judgment.

In response, I.A.E. and the Airport contend that Mr. Shaver's January 14, 1993 letter contract clearly reflected the purpose of the agreement between Mr. Shaver and Joint Venture: to create the schematic designs for the Project and then to use those designs in order to describe the scope of the Project, to get owner approval for the Project, and to be a reference for the design on the follow-up drawings. In exchange, Mr. Shaver was to receive $10,000. In I.A.E.'s view, the language of the contract is unambiguous, and the evidence of surrounding circumstances clearly shows that Mr. Shaver was hired specifically to create the schematic design documents which, Mr. Shaver admits, would be used to complete the air cargo building. There was no evidence, I.A.E. submits, that Mr. Shaver was promised the design development or final drawings for the Project. Moreover, Mr. Shaver exhibited his own intent to grant an implied nonexclusive license in his March 3, 1993 letter, when he stated, "[W]e trust that our ideas and the knowledge exhibited in our work will assist the Airport in realizing a credible and flexible use cargo/hangar facility," and enclosed copies of his drawings. In fact, the value of Mr. Shaver's drawings, I.A.E. comments, derives from their contemplated use in the air cargo building project; thus, by necessity, a nonexclusive license which authorized that use must be implied. I.A.E. notes that all the objective facts support a finding that an implied license exists; for example, the copyright registration certificates state that the drawings were intended for the Airport Project. According to I.A.E. and the Airport, therefore, Mr. Shaver implied a nonexclusive license for the use of his design drawings.

## II

## DISCUSSION

■ The district court granted summary judgment on the ground that there was no copyright infringement.[4] Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In this case, in which the parties filed cross-motions for summary judgment, our review of the court's summary judgment decisions is still plenary, as it would be in any summary judgment determination. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir.), *appeal dismissed and cert. denied*, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72 (1983). "We therefore apply the traditional standard that summary judgment will not lie unless, construing all inferences in favor of the party against whom the motion is made, no genuine issue of material fact exists." *Id.*

### A.

■ Proof of copyright infringement requires two showings: first, that the claimant has a validly owned copyright, and second, that the "constituent elements of the work that are original" were copied. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1295–96, 113 L.Ed.2d 358 (1991). The first element is not in contention; there is no challenge to the validity of Mr. Shaver's copyrights. It is the second prong of infringement that is at issue; Mr. Shaver asserted that his work was copied. The district court determined, however, that the use of his works was permissible because Mr. Shaver had granted an implied nonexclusive license.

■ A copyright owner may transfer to another person any of the *exclusive* rights the owner has in the copyright; however, such a transfer must be made in writing. 17 U.S.C. § 204(a);[5] *see also Effects Assocs. v.*

---

4. Federal courts have original and exclusive jurisdiction over copyright actions. 28 U.S.C. § 1338(a). In conjunction with our review of the copyright claim, we may also determine related questions of contract law. When the defendants claim a license, as they have in this case, we may consider the validity or scope of that license and typically must apply the relevant state law in that determination. *See* 3 *Nimmer* § 12.01[A], at 12–8 & n. 19 (citing *Bartsch v. Metro–Goldwyn–Mayer, Inc.*, 391 F.2d 150 (2d Cir.), *cert. denied*, 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968)).

5. **17 U.S.C. § 204. Execution of transfers of copyright ownership.**

*Cohen,* 908 F.2d 555, 557–58 (9th Cir.1990), *cert. denied,* 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991). The "transfer of copyright ownership" is defined, in the Copyright Act, as an exclusive license or some other instrument of conveyance. The definition expressly excludes a nonexclusive license. 17 U.S.C. § 101.[6] Therefore, even though section 204(a) of the Copyright Act invalidates any transfer of copyright ownership that is not in writing, section 101 explicitly removes a nonexclusive license from the section 204(a) writing requirement. We turn, therefore, to the differences between exclusive and nonexclusive licenses.[7]

■ In an exclusive license, the copyright holder permits the licensee to use the protected material for a specific use and further promises that the same permission will not be given to others. The licensee violates the copyright by exceeding the scope of this license.[8] The writing requirement serves the goal of predictability and certainty of copyright ownership. *Effects,* 908 F.2d at 557.

■ By contrast, in the case of an implied nonexclusive license, the licensor-creator of the work, by granting an implied nonexclusive license, does not transfer ownership of the copyright to the licensee. The copyright owner simply permits the use of a copyrighted work in a particular manner. In contrast to an exclusive license, a "nonexclusive license may be granted orally, or may even be implied from conduct." Melville B. Nimmer & David Nimmer, 3 *Nimmer* § 10.03[A] at 10–40.1; *see also MacLean Assocs., Inc. v. Wm. M. Mercer–Meidinger–Hansen, Inc.,* 952 F.2d 769, 778–79 (3d Cir. 1991); *Effects,* 908 F.2d at 558. *Nimmer* explains that a nonexclusive license "is not expressly provided in the statutory text, but is negatively implied from the fact that a 'transfer of copyright ownership,' which by definition does not include nonexclusive licenses (see 17 U.S.C. § 101) must be by written instrument." 3 *Nimmer* § 10.03[A] at 10–40.1 n. 19. A nonexclusive license is, therefore, an exception to the writing requirement of section 204. In fact, consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing.[9] Although a person holding a nonexclusive license has no standing to sue for copyright infringement, Paul Goldstein, I *Copyright: Principles, Law and Practice* § 4.4.1.1, at 409 (1989), the existence of a license, exclusive or nonexclusive, creates an affirmative defense to a claim of copyright infringement. *Effects,* 908 F.2d at 559. The concept of an implied nonexclusive license has been recognized not only by *Nimmer,* a preeminent treatise on copyright law, but also by the courts, including this one, which universally have recognized that a nonexclusive license may be implied from conduct.[10]

(a) A transfer of copyright ownership … is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

**6. 17 U.S.C. § 101. Definitions**
A "transfer of copyright ownership" is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.

**7.** A "license" was described by Judge Swan of the Second Circuit more than a half-century ago in these terms: "In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent." *Western Elec. Co. v. Pacent Reproducer Corp.,* 42 F.2d 116, 118 (2d Cir.), *cert. denied,* 282 U.S. 873, 51 S.Ct. 78, 75 L.Ed. 771 (1930).

**8.** *See S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1087 (9th Cir.1989) ("A licensee infringes the owner's copyright if its use exceeds the scope of its license."); *Western Elec.,* 42 F.2d at 118 ("In *Heap v. Hartley,* 42 Ch.Div. 461, 470, Lord Justice Fry defined an exclusive license as 'leave to do a thing, and a contract not to give leave to anybody else to do the same thing.' ").

**9.** *See Pinkham v. Sara Lee Corp.,* 983 F.2d 824, 831 (8th Cir.1992) ("[U]nlike an exclusive license, an authorization can be given orally or implied from conduct."); *see also Effects,* 908 F.2d at 558–59; *MacLean,* 952 F.2d at 778–79; 3 Nimmer § 10.03[A] at 10–36.

**10.** *See, e.g., MacLean,* 952 F.2d at 778–79 (adopting *Effects* analysis, concluding that nonexclusive implied license had been created); *Effects,* 908 F.2d at 558 (concluding that Effects impliedly granted nonexclusive licenses and thereby gave up its right to sue for copyright infringement); *Gracen v. Bradford Exchange,* 698 F.2d 300, 303 (7th Cir.1983) (considering the scope of an implied nonexclusive license after confirming that

Indeed, implied licenses [11] are like implied contracts, which are well recognized in the field of architecture.[12] As the district court noted, the Ninth Circuit, in *Effects,* held that an implied nonexclusive license has been granted when (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work. *Effects,* 908 F.2d at 558–59.

### B.

In light of these principles, we now turn to the record before us. In our analysis, we find helpful, as did the district court, the opinion of our colleagues in the Ninth Circuit in *Effects.* In the case before us, as in *Effects,* Mr. Shaver created a work at Joint Venture's request and handed it over, intending Joint Venture to copy and distribute it for the Airport Project. Mr. Shaver maintains that his expectation was that he would be the architect who would be preparing the final drawings, presumably from his own preliminary drawings, to be used for the construction. We therefore must determine whether the record will support a determination that such an interpretation had any objective foundation.

*Effects* suggests several objective factors to guide the judicial inquiry as to whether an implied license exists: the language of the copyright registration certificate, the letter agreement, and deposition testimony; and the delivery of the copyrighted material without warning that its further use would constitute copyright infringement. *Effects,* 908 F.2d at 559 n. 6. When we apply these factors to the circumstances before us,

we must conclude that there is no genuine issue of triable fact and that the district court concluded correctly as a matter of law that Mr. Shaver granted an implied nonexclusive license to Joint Venture.

We note first that Mr. Shaver's certificates of registration, entitling the drawings "East Air Cargo Building, Gary Regional Airport, Indiana: Not Yet Constructed," state that copyrighted designs are to be used for the "Airport Facility." We now turn to the language of the contract itself. The contract in this case was a letter written by Mr. Shaver. This letter, apparently in confirmation of an earlier telephone conversation, demonstrates that the relationship of independent contractor for the purpose of creating the preliminary drawings for the Airport Project existed between Mr. Shaver and Joint Venture. It defines his role in the Airport Project and, specifically, his "understanding of the scope of work": preparation of the preliminary schematic design drawings, which were 15–19% of the total design work. Mr. Shaver stated that his drawings are the type "customarily prepared to describe the scope of the project and also for general reference." R. 43 Ex. 3. Mr. Shaver also quoted the consideration for his work, $10,000. Mr. Shaver's statement that "agreed design parameters can be established initially to permit the Project to proceed in a normal development manner," *id.,* certainly suggests that he considered his contribution to be in furtherance of the entire Project. In short, his letter was clear, to-the-point, and unambiguous. No other work is listed; no expectation of a further role in the Project is mentioned in the contract. Therefore, although Mr. Shaver tells us that he anticipated he would be the architect to

---

"Nimmer is right" that unwritten licenses such as oral and implied nonexclusive copyright licenses are enforceable); *see also Avtec Sys., Inc. v. Peiffer,* 21 F.3d 568, 574 n. 12 (4th Cir.1994) (noting in dictum that "an implied license is necessarily nonexclusive and revocable absent consideration" and that, "while an implied license may fail to vest a proprietary interest in the licensee that is enforceable against other licensees, it may provide a defense ... to the counterclaim").

11. *See Effects,* 908 F.2d at 559 n. 7 (noting that an implied license is "a creature of law much like any other implied-in-fact contract").

12. *See* Justin Sweet, *Legal Aspects of Architecture, Engineering and the Construction Process* § 5.04, at 39 (5th ed. 1994) ("In express contracts, the parties manifest their assent or agreement by oral or written words. In implied-in-fact contracts, assent is manifested by acts rather than by words.... Unless the agreement is required to be in writing, the implied-in-fact agreement is as valid as an express contract.").

take the Project to completion, nothing in his contract gives the slightest indication of that belief. Although Indiana law allows contractual terms to be implied from the intent and action of the parties, the "intent relevant in contract matters is not the parties' subjective intent but their outward manifestation of it." *Real Estate Support Servs., Inc. v. Nauman*, 644 N.E.2d 907, 910 (Ind.Ct.App.1994). Here the contract is clear.[13]

The plain language of the contract is supported by common sense. As we have already pointed out, Mr. Shaver created a work—preliminary architectural drawings—and handed them over to the Joint Venture for use on the Airport Project. For that work the architect received $10,000 compensation. As the Ninth Circuit concluded in *Effects*:

> To hold that Effects did not at the same time convey a license to use the footage in "The Stuff" would mean that plaintiff's contribution to the film was "of minimal value," a conclusion that can't be squared with the fact that Cohen paid Effects almost $56,000 for this footage. Accordingly, we conclude that Effects impliedly granted nonexclusive licenses. . . .

908 F.2d at 559; *see also Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir.1984) (concluding that an implied license existed, but that the scope of that license was exceeded).

This understanding is reflected throughout the parties' depositions and affidavits. Joint Venture clearly expected to use Mr. Shaver's drawings for the Project. Mr. Talluri expected that Mr. Shaver's schematic design drawings were to be used in the Airport Project for which they were intended and stated that the drawings were used only in that manner, despite the fact that Mr. Shaver was not the continuing architect. R. 48.[14]

Not only the language of the copyright registration certificates, the letter contract, and the depositions and common sense support the conclusion of the district court that the defendants had an implied nonexclusive license to use Mr. Shaver's drawings in the Airport Project; Mr. Shaver's actions and subsequent writing also unequivocally support that conclusion. Mr. Shaver delivered his copyrighted designs without any warning that their further use would constitute copyright infringement. In his March 3, 1993 letter, Mr. Shaver acknowledged that he was no longer a contributor to the Project's development, but that he expected "that our ideas and knowledge exhibited in our work will assist the Airport in realizing a credible and flexible use Cargo/Hangar facility." This statement, accompanied by the delivery of copies of his drawings, certainly constitutes a release of those documents to the Airport for its Project and clearly validates a determination that all the objective factors support the existence of an implied license to use Mr. Shaver's drawings in the construction of the air cargo building.

On this record, we cannot conclude that Mr. Shaver has raised a genuine issue of material fact on the issue of the parties' intent. His contention that he never intended to grant a license for the use of his drawings past the drafting stage unless he was the *continuing* architect is simply not supported by the record.

## C.

Mr. Shaver also makes several alternative arguments that accept the existence of a nonexclusive implied license, but suggest that, under the circumstances established by the record, it cannot be enforced. We believe that these arguments cannot be maintained in light of our analysis, but we shall address them briefly for the sake of completeness.

 Mr. Shaver submits that, even if there was an implied license for the use of his drawings, the Airport, Cantrell and Joint

---

13. In any event, for the reason stated by the district court, we cannot accept the contention that there are factual issues concerning custom and usage in the architecture profession or public policy issues forbidding the use of implied nonexclusive licenses for architects' contracts that preclude summary judgment.

14. We also note Mr. Shaver's explanation in his brief, that he "anticipated that his copyrighted drawings would be used to complete the building." *See* Appellant's Br. at 19.

Venture exceeded the scope of that license by allowing another architect, Cantrell, to use the designs. He relies on *Oddo v. Ries,* 743 F.2d 630 (9th Cir.1984). *Oddo* held that Ries, a publisher, had an implied nonexclusive license to use Oddo's articles to create a particular book. However, Ries exceeded the scope of that implied license when it hired another writer and created a different work, one which included much new material written by the second writer as well as large portions of Oddo's manuscript. By publishing the other writer's book, which was distinct from the plaintiff's manuscript originally licensed for use, the defendant exceeded the scope of the partnership's implied license. In our case, however, the record contains written authorization for the use of Mr. Shaver's copyrighted drawings to "describe the agreed scope of the Project" for Joint Venture and the Airport. The use of his drawings was therefore within the scope of that agreement. Mr. Shaver's assertion that he did not grant the right to further use of his drawings unless he was the architect continuing the Project is simply not supported by the contract. *See Oddo,* 743 F.2d at 634 (holding that Oddo granted Ries a license to use his articles "insofar as they were incorporated in the manuscript" being prepared under the Oddo–Ries partnership, but did not give Ries or the partnership "the right to use the articles in any work other than the manuscript itself"). Mr. Shaver's reliance on *Oddo* is therefore of no benefit to him.

█ Mr. Shaver also asserts that, because only half of the contract sum was paid, the implied license "did not spring into existence." Appellant's Br. at 26. In *Effects,* the Ninth Circuit rejected a virtually identical argument that there could be no implied license until the full payment of the contract price was made. *Effects,* 908 F.2d at 559 n. 7. That court recognized that the appellant was treating the complete payment of the contractual consideration as a condition precedent to the use of the copyrighted material. After noting that "conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language," *id.,* it found nothing in the agreement between the parties indicating such an agreement. Similarly, in the case before us, nothing in the contract or in Mr. Shaver's later letter indicates that full payment was a condition precedent to the use of his drawings. In fact, he first distributed his drawings before any payment was made, and next handed them over to the Airport, with no mention of payment, after half the dollar amount of the contract had been tendered. Clearly at that point a license to use the drawings had impliedly been granted. Mr. Shaver did not state that failure to pay would be viewed as copyright infringement until the March 10, 1993 letter from his attorney.

### Conclusion

Mr. Shaver created an implied nonexclusive license to use his schematic design drawings in the Airport Project. Accordingly, there was no infringement of Mr. Shaver's copyrighted works. We conclude that, because there are no genuine issues of material fact before us, we must affirm the judgment of the district court.

AFFIRMED.