**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SAXELBYE ARCHITECTS,
INCORPORATED, a Florida professional
corporation,
<u>Plaintiff-Appellant,</u>

v.

FIRST CITIZENS BANK & TRUST
COMPANY, a North Carolina

chartered institution; CARLOS G.
DELVALLE, an architect with
Rolland, DelValle & Bradley,
Incorporated; ROLLAND, DELVALLE
& BRADLEY, INCORPORATED, a Florida
professional corporation,
<u>Defendants-Appellees.</u>

No. 96-2766

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, Chief District Judge.
(CA-96-143-5-F)

Argued: August 12, 1997

Decided: November 3, 1997

Before RUSSELL and HALL, Circuit Judges, and MICHAEL,
Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Bernard Lawrence Sweeney, BIRCH, STEWART, KOLASH & BIRCH, L.L.P., Falls Church, Virginia, for Appellant. Susan Freya Olive, OLIVE & OLIVE, P.A., Durham, North Carolina; Mark Stanton Thomas, MAUPIN, TAYLOR & ELLIS, P.A., Raleigh, North Carolina, for Appellees. **ON BRIEF:** Robert J. Kenney, BIRCH, STEWART, KOLASH & BIRCH, L.L.P., Falls Church, Virginia, for Appellant. Bruce Vrana, OLIVE & OLIVE, P.A., Durham, North Carolina; Donald J. Eglinton, Daniel Lee Brawley, Sr., Robert E. Futrell, Jr., WARD & SMITH, P.A., New Bern, North Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Saxelbye Architects, Inc., appeals the dismissal of its copyright infringement claims against the First Citizens Bank and Trust ("FCB"), Rolland, DelValle & Bradley, Inc. ("RDB") (another architectural firm), and RDB's president, and the dismissal of its breach of contract claim against FCB. We reverse and remand for further proceedings.

I

The district court dismissed the claims pursuant to Fed. R. Civ. P. 12(b)(6) (copyright) and 12(c) (breach of contract). Therefore, our review is de novo, and our analysis is limited to the facts alleged in the complaint, which we assume to be true and which we construe in the light most favorable to Saxelbye. See Schatz v. Rosenberg, 943 F.2d 485, 489 (4th Cir. 1991) (Rule 12(b)(6) dismissal for failure to state a claim); George C. Frey Ready-Mixed Concrete, Inc. v. Pine

2

Hill Concrete Mix Corp., 554 F.2d 551, 553 (2d Cir. 1977) (Rule 12(c) dismissal on the pleadings).

In August 1994, FCB solicited Saxelbye and other architectural firms to submit bids to perform design and planning services for FCB's proposed $14-20 million operations center in North Carolina. FCB envisioned that an existing data processing building would be renovated and that a new building would be constructed nearby. Carlos DelValle and Sandra Bradley were key members of the Saxelbye team that put together a multi-phase proposal including architectural design and construction administration services. Saxelbye was selected and began work in early October 1994. In February 1995, FCB vice-president Gary Williams signed three separate documents -- "Project Understanding," "Scope of Services," and "Fee Schedule" -- that, taken together, were characterized by Saxelbye in a cover letter as a "revised Agreement." After meeting in early April to discuss changes to the project, Williams signed revisions of the "Scope of Services" and "Fee Schedule" documents.

Phase II, "Schematic Design," culminated in a final set of drawings developed by DelValle that was delivered to FCB on July 7, 1995. That same afternoon, DelValle, Bradley and Jeffery Rolland (a vice-president at Saxelbye) quit the firm and established RDB. On July 24, 1995, FCB informed Saxelbye that the bank would complete the project with RDB. Saxelbye was paid $256,000 for services rendered to that point, including the Phase II schematic drawings. By letter dated July 27, 1995, Saxelbye informed FCB that it considered the drawings its (Saxelbye's) property and that "no one else has permission or legal use of any documents Saxelbye prepared as instruments of service for your project."

In February, 1996, Saxelbye sued FCB, RDB, and DelValle for copyright infringement for the (intended) use of the drawings developed while RDB's founders were at Saxelbye. The second cause of action alleges that FCB's termination of the multi-phase contract constituted a breach.[1] The district court ruled that the complaint and attached exhibits failed to make out a breach of contract claim

_____

1 Saxelbye also filed a Florida state court action against RDB and its principals for tortious interference with contract.

3

because there was never a sufficiently definite agreement as to price; therefore, the alleged contract for the complete project was merely an "agreement to agree." The court also ruled that Saxelbye had failed to state a copyright infringement claim because FCB had an implied nonexclusive license to use the drawings for which it had paid Saxelbye in full. Saxelbye appeals.

II

We turn first to the contract claim. The district court examined the "fee schedule" attachment to the April 1995 agreement and found the pricing formulas to be too vague. For instance, only one of the projected phases had a definite dollar estimate attached; other costs were

> estimated on a lump sum basis, square foot basis or a per-man-per-day-per-report basis. . . . In short, although the parties well may have contemplated a long-term relationship, the written documents which Saxelbye itself prepared and has pled constitute the formal memorialization thereof are not sufficiently definite as to the price term to amount to an enforceable contract; this "contract" for personal services is incapable of enforcement or of reduction to judgment. It is an agreement to agree.

Saxelbye Architects, Inc. v. First Citizens Bank & Trust Co., No. 5:96-CV-143-F(1) at 5 (E.D.N.C. Oct. 26, 1996) ("Order")[2] (hereinafter "June order"). We believe, however, that the fee schedule is sufficiently definite to permit the contract claim to survive a Rule 12(c) motion to dismiss.

Florida follows the black-letter rule that the intent of the parties controls and that this intent should be determined from the language of the alleged contract if that language is unambiguous. See

_____

[2] Although the district court dismissed all claims against FCB by order dated June 10, 1996 ("June order"), the court's analysis of the breach of contract issue is expanded upon in the October 26, 1996 order containing the rulings on DelValle and RDB's motion to dismiss the copyright claims against them.

4

Robbinson v. Central Properties, Inc., 468 So.2d 986, 988 (Fla. 1985).[3] But price, an essential element, need not be a definite amount in order for the contract to be enforceable. "If the parties provide a practicable, objective method for determining this price or compensation, not leaving it to the future will of the parties themselves, there is no such indefiniteness or uncertainty as will prevent the agreement from being an enforceable contract." Corbin on Contracts, Vol. I (1963), § 97, at 424 (quoted in Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Financial Corp., 302 So.2d 404, 409 (Fla. 1974)). Moreover, "[t]he courts should be extremely hesitant in holding a contract void for indefiniteness . . . . The contract should not be held void for uncertainty unless there is no other way out." Blackhawk at 408-09. With these principles in mind, we turn to the relevant portions of the alleged contract.

As the various options were presented to the bank and changes to the project design were made, the scope of the project changed, and the price necessarily remained somewhat fluid.[4] FCB makes no attempt to explain how such a project could proceed otherwise, and, inasmuch as the case was decided on the pleadings, we have no evidence about the usual industry practice. However, it is apparent that the nature of a large project such as this one makes it difficult to come up with firm dollar figures at the outset. Most phases of the Saxelbye plan included a fairly definite method for arriving at Saxelbye's fees, usually based on a dollar figure multiplied by the size of the area cov-

_____

[3] Although FCB argued below that North Carolina substantive law should govern the breach of contract claim, the district court disagreed, and FCB has made no effort on appeal to convince us that the district court's choice of Florida law was incorrect. See Kaiser Foundation Health Plan v. Clary & Moore, P.C., 123 F.3d 201 (4th Cir. 1997) ("[B]ecause neither party questions the applicability of Virginia law, we will assume without deciding that it properly controls our decision").

[4] Saxelbye sent FCB a letter accompanying the proposal stating that the architectural firm would send a standard AIA owner/architect contract for FCB's approval to serve as the "basic contract to be amended as subsequent phases are negotiated and Saxelbye is authorized to proceed," although no such standard contract was ever executed. That future writings may have been contemplated does not of itself necessarily preclude a finding that the parties had already entered into a contract.

5

ered by the particular phase. For instance, Phase V included the design of plans for the interior of the proposed new building, and the fee schedule called for a lump sum of $9,500 for the first 10,000 square feet of office space and 83¢ per square foot thereafter. The size of the building was ultimately up to FCB, but once it was determined, the price could be arrived at by simple multiplication. Most of the fee schedule contained similar formulas.

The costs associated with the renovation of the existing building were left open because the scope of that portion of the project depended on the completion of the first three phases of the project.[5] Inasmuch as the renovation portions of the plan are easily separable (if necessary) from the rest of the project, the indefiniteness of the fees for the renovation is an inadequate basis upon which to dismiss the contract claim at this early point in the proceedings.

Other than price, the allegations in the complaint clearly support Saxelbye's argument regarding the formation of the contract. For instance, Saxelbye alleges that the presentations to FCB always included a comprehensive plan and schedule for completing the project and that FCB told the architectural firm that it had been selected to provide the full range of proposed services. See complaint, ¶¶ 19 & 20. We hold, therefore, that the district court erred in dismissing the breach of contract claim for failing to state a claim on the basis of the price factor, and we reverse that portion of the court's judgment and remand for further proceedings.

III

We will assume for purposes of this appeal that Saxelbye owned the copyright in the Phase II drawings. See complaint ¶ 50. Infringement of that copyright requires a showing that the copyrighted work was "copied," i.e. that one of the exclusive rights conferred by a copyright on Saxelbye was encroached upon. See Avtec Systems, Inc. v.

_____

[5] The fee schedule for phases IV and V contained the following note: "Fee cannot be provided for existing data center building renovation until phases I, II and III are completed and scope of work is clearly defined. Fee shall be provided at that time either as a percentage of construction cost or on a lump sum basis."

6

Peiffer, 21 F.3d 568, 571 (4th Cir. 1994). As a rule, transfers of exclusive copyright interests must be in writing to be valid. See 17 U.S.C. § 204(a). The district court, however, grounded its dismissal of the copyright claims on an exception to this general rule.

A "nonexclusive license" is the permission to use a copyrighted work in a particular specified manner, and, by statutory definition, "nonexclusive licenses" need not be in writing. See 17 U.S.C. § 101. This permission may be implied from the conduct of the parties. Melville B. Nimmer and David Nimmer, 3 Nimmer on Copyright § 10.03[A], at 10-38 (1994). Such a license is granted when the licensee requests the creation of the work and the licensor creates it and delivers it to the licensee with the intent that the licensee copy (use) it.

The district court held that the absence of an express agreement that the drawings could not be used amounted to implied permission that they could be:

> In the absence of explicit or implicit limitations to the contrary, a party who purchases architectural services is entitled to use the drawings produced in conjunction therewith for the construction project for which the drawings were prepared. That is, absent an agreement to the contrary, an implicit non-exclusive license, limited to the particular project, is created for the owner by implication.

October order at 6.

The district court's copyright ruling was based on I.A.E., Inc. v. Shaver, 74 F.3d 768 (7th Cir. 1996), which it found to be "persuasive authority and, as to material facts, essentially indistinguishable." June order at 2. Shaver is distinguishable in several significant respects, and we disagree that the existence of such a license can be established on the basis of this complaint.

In Shaver, the firm that had the design/construction contract subcontracted with Shaver for schematic drawings (the first of four planned design phases) for $10,000; nothing more was said to Shaver

7

about the remainder of the project. After the drawings were delivered and Shaver was paid, the firm hired another architect for the remainder of the project, and Shaver sued for infringement. In affirming the summary judgment dismissing the infringement claims, the court of appeals found no "objective foundation" for Shaver's contention that he reasonably believed that he would be the architect throughout the project. Id. at 776. The appeals court found the contract for the drawings to be unambiguous, and the court also noted that Shaver gave the drawings without any warning that any further use would constitute infringement. Id. at 776-77. Under these circumstances, the court held that the law would imply a license to use the drawings and that the scope of the use -- for the intended structure only -- did not exceed the scope of the license.

Shaver clearly did not have a contract for any portion of the overall project beyond the initial design phase drawings; he had, instead, a mere expectation that he would get further contracts for additional phases once his initial drawings were approved. Id. at 771. Saxelbye, on the other hand, might (as we discuss above in Part II) indeed have a contract for the completion of the entire project. If, as Saxelbye contends, the drawings were submitted solely for the bank's approval and comments, then the drawings were not an end-product for use by FCB but, rather, a tool to be used by Saxelbye to complete the project.

The implied-license exception to the requirement of a writing is a limited one. See Effects Associates, Inc. v. Cohen, 908 F.2d 555, 558 (9th Cir. 1990). There is certainly no evidence at this point that such a license was given orally by Saxelbye. As we explain in Part II, the complaint sufficiently alleges that the parties always intended that Saxelbye complete the entire project and that the delivery of the drawings was simply the agreed upon practice to obtain further approval to move on to the next phase; The two issues -- contract formation and implied license -- are intertwined, and factual issues remain about the parties' intentions as to the use of the Phase II plans by FCB. See Johnson v. Jones, 885 F. Supp. 1008, 1014 (E.D. Mich. 1995) ("[A]ll of the circumstances surrounding the negotiations made between the parties must be considered to determine if and to what extent an implied license was granted"). We reverse the dismissal of

8

the copyright claims and remand to the district court for further proceedings.[6]

<u>REVERSED AND REMANDED</u>

_____

[6] In light of our rulings, we do not reach the issue of the denial of Sax-elbye's motion to file an amended complaint.

9