97 F.3d 377
 1996 Copr.L.Dec. P 27,568, 40 U.S.P.Q.2d 1295,
96 Cal. Daily Op. Serv. 7453,
96 Daily Journal D.A.R. 12,254
 DISENOS ARTISTICOS E INDUSTRIALES, S.A.; Lladro USA, Inc.,
Plaintiffs-Appellees,
v.
COSTCO WHOLESALE CORPORATION, Defendant-Appellant.
DISENOS ARTISTICOS E INDUSTRIALES, S.A., Plaintiff-Appellee,
v.
COSTCO WHOLESALE CORPORATION, Defendant-Appellant.
 Nos. 95-55018, 95-55106.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 13, 1995.
Decided Oct. 8, 1996.
 
 Michael D. Sandler, Foster, Pepper & Shefelman, Seattle, WA, for defendant-appellant.
 Charles E. Buffon (argued), and Caroline M. Brown (on the briefs), Covington & Burling, Washington, DC, for plaintiffs-appellees.
 Appeal from the United States District Court for the Central District of California, Richard A. Paez, District Judge, Presiding. D.C. No. CV-93-07061-RAP.
 Before: BOOCHEVER, NELSON and KLEINFELD, Circuit Judges.
 OPINION
 KLEINFELD, Circuit Judge:
 
 
 1
 This is a copyright case involving importation of Lladro figurines. We conclude that the defendant was entitled to summary judgment because the undisputed facts established implied authority for the importation.
 
 FACTS
 
 2
 The copyrighted objects at issue in this case are Lladro figurines. These are decorative figurines designed for collection and display. They are copyrighted by the lead plaintiff, Disenos Artisticos E Industriales, S.A. (DAISA), a Spanish Corporation.
 
 
 3
 DAISA, the copyright owner, is part of a group of related corporations. Lladro Comercial, S.A. is the parent corporation, and through intermediaries, wholly owns DAISA. Lladro USA's business strategy in the United States is to market the figurines only to select up-scale retailers. It spends considerable money on marketing to promote the reputation of the brand as high quality collectors' items and supports auctions establishing a secondary market for the figurines.
 
 
 4
 DAISA, the copyright owner, does not manufacture the figurines itself. Nor does the parent corporation. Instead, DAISA licenses the copyright to four Spanish corporations, all affiliated with the Lladro group, and contracts with them to manufacture the figurines.
 
 
 5
 The manufacturers are licensed not only to produce, but also to sell the figurines "to all countries of the world, without the existence of any limitations or exclusions of territory." DAISA does not restrict its licensees at all with respect to distribution.
 
 
 6
 The licensed manufacturers do not, however, take advantage of their license from DAISA to sell to all countries of the world. Instead, each has a contract with the parent corporation, Lladro Comercial, to sell the entire output of figurines to the parent corporation. The parent corporation then distributes the figurines throughout the world. The manufacturers' contracts with the parent corporation provide that the parent corporation controls the means of sale, "selecting the appropriate category of the places to sell as well as the distributors and representatives."
 
 
 7
 The parent corporation then sells the figurines, directly to retailers in some countries, and to distributors in others. In its contract with Lladro USA, the parent corporation promises not to export the figurines to anyone but Lladro USA within the fifty states of the United States. The parent further covenants that it "shall not knowingly cause any third party to sell the Product in the Territory," "nor shall authorize any other party to distribute the Product within the Territory."
 
 
 8
 Lladro Comercial has at least three arrangements regarding re-export. It has contracts with some distributors prohibiting commercial re-export and even sales of large quantities to other retailers who might themselves export. Other distributors are prohibited only from "carry[ing] out an active marketing policy of the product outside the territory," as by "publicity" or starting a subsidiary. In a third arrangement, Lladro Comercial directly or through distributors sells to retailers without any contractual restrictions at all.
 
 
 9
 The defendant, Costco, operates a chain of retail stores throughout the United States. During the years relevant to this case, 1990 through 1994, it sold Lladro figurines in its stores. None of the figurines were pirated copies or fakes. All were genuine and were manufactured pursuant to the manufacturing license granted by DAISA. Lladro USA has not sold figurines to Costco, or authorized Costco to sell them.
 
 
 10
 Costco did not import any of the figurines. All of the figurines in question were purchased from various other sources within the United States. Most of the boxes in the Costco stores had a portion of the box sliced off. Lladro's detective work suggested the likelihood that Costco's figurines were distributed within Spain, and ultimately wound up in the United States through chains of distribution other than those Lladro Comercial intended, and definitely not through Lladro USA. Some came from countries where they were sold directly to retailers without contractual restrictions. For example, some were imported by an American company from a store in Mexico that went out of business. The Mexican store had no contractual agreement with any Lladro affiliate restricting its right to market inventory in the United States or anywhere else.
 
 
 11
 DAISA and Lladro USA filed a complaint in federal district court alleging that Costco's sale of Lladro figurines was unauthorized and in violation of section 602(a) of the Copyright Act. On cross motions for summary judgment, the district court granted summary judgment in favor of Lladro USA and DAISA, on the theory that the sales to Costco were not authorized.
 
 ANALYSIS
 
 12
 We review the summary judgment de novo. Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).
 
 
 13
 We begin with the statute upon which DAISA and Lladro rely, which prohibits importation of copyrighted goods into the United States "without the authority of the owner of copyright":
 
 
 14
 Importation into the United States, without the authority of the owner of the copyright under this title, of copies or phonorecords of a work that has been acquired outside the United States is an infringement of the exclusive right to distribute copies....
 
 
 15
 17 U.S.C. § 602(a). This statute is part of the legislative scheme for dealing with pirated and "gray market" goods. In the trademark context, "[a] gray-market good is a foreign-manufactured good, bearing a valid United States trademark, that is imported without the consent of the United States trademark holder." K mart Corporation v. Cartier, Inc., 486 U.S. 281, 285, 108 S.Ct. 1811, 1814, 100 L.Ed.2d 313 (1988). Copyright and trademark owners fought a lengthy and intense legislative battle over the degree to which they would be able to use the customs service and federal law to control the flow of gray market goods. Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.11[B] (1992). Copyright and trademark law are not the only means of protecting the integrity of a distributorship network, of course. To the extent that the copyright owner has enough market power to obtain and enforce them, it can use contractual restrictions on resale. It can also buy back unsold inventory, as chewing gum and magazine distributors typically do. Wholesalers and retailers may bargain for the right to sell back unsold inventory, or the freedom to liquidate it however they can. We should not put our thumb on the legislative scale. A court construing a statute should avoid adding to or detracting from the benefits Congress accorded to any of the competing interests.
 
 
 16
 Costco did not import any of the figurines, so on its face, the statutory prohibition of "importation into the United States" might be understood not to have any application. DAISA argues that under Parfums Givenchy, Inc. v. Drug Emporium, Inc., 38 F.3d 477, 482 (9th Cir.1994), a retailer can violate section 602(a)'s importation restriction even if it does not import into the United States. Costco offers arguments which would factually distinguish and limit Parfums Givenchy.
 
 
 17
 DAISA concedes that under its interpretation of section 602(a) and Parfums Givenchy, every little gift shop in America would be subject to copyright penalties for genuine goods purchased in good faith from American distributors, where unbeknownst to the gift shop proprietor, the copyright owner had attempted to arrange some different means of distribution several transactions back. DAISA suggests that the answer to this problem is for each gift shop proprietor to obtain from the copyright owner (not his seller) a certification that the importation into the United States was authorized.
 
 
 18
 Costco also argues that the first sale doctrine, at common law or as codified in 17 U.S.C. § 109(a), which limits the right of a copyrighter to control disposition of a genuine copy after the first sale of that copy, supplies a defense in this case because DAISA obtained the benefit of its copyright at the time of its first lawful sale abroad. DAISA argues, based on Parfums Givenchy and BMG Music v. Perez, 952 F.2d 318 (9th Cir.1991), that the first sale doctrine does not provide a defense to copyright infringement until there is an authorized first sale in the United States.
 
 
 19
 The impracticality of the burden DAISA would have us impose on the retailers gives us pause about whether its reading of Parfums Givenchy and BMG Music is correct. But we do not reach either issue in our disposition. We thus have no occasion to decide whether Costco as a non-importer can be liable for importation under section 602(a), or whether the first sale doctrine applies in this case. Unlike Givenchy and BMG Music, this case is resolved on whether the importation was authorized.
 
 
 20
 Under section 602(a), the only authorization that counts is authorization by "the owner of the copyright." DAISA owns the copyright, not Lladro Comercial or Lladro USA. It is true that DAISA is a subsidiary of Lladro Comercial, but that does not mean that the parent owns the copyright. Lladro Comercial would have us pierce its own corporate veil. But a corporation is not entitled to establish and use its affiliates' separate legal existence for some purposes, yet have their separate corporate existence disregarded for its own benefit against third parties. Generally, the corporate veil can be pierced only by an adversary of the corporation, not by the corporation itself for its own benefit. United Continental Tuna Corp. v. United States, 550 F.2d 569, 573 (9th Cir.1977); Harry G. Henn & John R. Alexander, Laws of Corporations and Other Business Enterprises § 149, at 347 ("corporateness is rarely disregarded" for the benefit of the shareholders).
 
 
 21
 Because DAISA owned the copyright, we determine whether importation was "without the authority of the owner" by examining the conduct of DAISA. DAISA's arrangements were with its licensees only. DAISA authorized its licensee manufacturers to sell the figurines to "all countries of the world." It did not require its licensees to restrict the sales in any way. So far as DAISA's contracts provided, any of the manufacturers could distribute any of the figurines directly or indirectly into the United States.
 
 
 22
 Costco argues this express grant of authority flows downstream to all subsequent purchasers, so, as a subsequent purchaser, Costco has express authority under section 602(a). DAISA argues that because Lladro USA has the only express grant of authority to import into the United States, Costco's liability for infringement cannot be avoided on the basis of express authority. We do not decide whether the grant of express authority by the copyright owners, DAISA, to its licensee manufacturers to sell "all countries of the world" amounts to an express authorization for "importation into the United States." Implied authority is plain enough, so that we need not reach the question of express authority.
 
 
 23
 In Effects Associates, Inc. v. Cohen, 908 F.2d 555 (9th Cir.1990), we held that a party's "conduct created an implied license" to use copyrighted material. Id. at 558. The statutory language supports this interpretation of "authority" in 17 U.S.C. § 602(a) to include implied authority. In at least two other copyright statutes, Congress uses the phrase "except with the express consent of the copyright owner." See, e.g., 17 U.S.C. § 112(e); 17 U.S.C. § 115(a)(2). In the trademark law analogous to 17 U.S.C. § 602(a), importation of marked merchandise is generally prohibited "unless written consent of the owner of such trademark is produced at the time of making entry." 19 U.S.C. § 1526(a). When Congress resolved the gray market battle between retailers and copyright owners under section 602(a), it did not do it with the words "express consent" or "written consent." Instead it said "authority," which ordinarily includes implied authority. Cf. Thomas v. INS, 35 F.3d 1332, 1339 (9th Cir.1994); In re Nelson, 761 F.2d 1320, 1322 (9th Cir.1985); Pinkham v. Sara Lee Corp., 983 F.2d 824, 831 (8th Cir.1992).
 
 
 24
 The authority to export to the United States must necessarily imply the authority to import into the United States, commercially as well as logically. Lladro USA's evidence on summary judgment shows how a secondary market supports a higher price:
 
 
 25
 Lladro USA manages the Lladro Collectors Society and publishes Expressions Magazine, both of which are dedicated to serving the needs of collectors of Lladro figurines. Lladro USA has also published two high quality "art" books devoted to the study of Lladro figurines.
 
 
 26
 Lladro USA promotes two annual auctions in the United States at which investors in Lladro figurines may buy and sell their figurines. Because of Lladro's high quality, high prestige reputation, many people are able to realize a return several times their investment at these auctions.
 
 
 27
 Likewise, the existence of a liquidation market could be expected to support a higher wholesale price. When a purchaser of Lladro figurines from Lladro Comercial bargains for the right to export them outside its territory, it can afford to pay more for them, because of the larger market for liquidation of excess inventory. Some of the Costco figurines were derived from a Mexican store which had closed. That store had purchased its figurines with no restriction upon its right to resell them. Had Lladro Comercial bargained with that store owner for a prohibition upon his right to sell them into the United States, then the store owner would have had to consider the smaller market available for liquidation when she considered how much money she could afford to commit to Lladro inventory. The right to export would be valueless if it did not imply a right to import.
 
 
 28
 Costco argues that authority for importation into the United States has to be inferred from DAISA's authorization to its licensee manufacturers to sell the figurines anywhere in the world. DAISA and Lladro Comercial argue that only Lladro USA had express authority to import, and it was plain from the distribution scheme organized by Lladro Comercial that Lladro USA was intended to be the only authorized importer. Because DAISA owned the copyright, and authorized export into the United States, we find Costco's argument to be the persuasive one.
 
 
 29
 Lladro Comercial correctly points out that the manufacturers did not export the figurines into the United States, but sold all of them to Lladro Comercial, whose intent was to make Lladro USA the exclusive United States distributor. This is irrelevant for purposes of section 602(a), because Lladro Comercial was not the copyright owner. Lladro Comercial owned the goods, was the parent company of the company which copyrighted them, and was indirectly the United States distributor, but it did not own the copyright. Section 602(a) confers power only on the "owner of the copyright." Where the owner of the goods is a separate firm from the owner of the copyright, it cannot use Section 602(a) to control its distribution network.
 
 
 30
 Authorization by a copyright owner to export goods to anywhere in the world necessarily implies authority to import the goods into the United States. So do sales without restriction on export into the United States. No written or express authorization to import is required by 17 U.S.C. § 602(a). Therefore, absence of written authorization to import does not establish the element of a claim under 17 U.S.C. § 602(a), that the importation is "without the authority of the owner," at least where other words or conduct imply authority. Accordingly, in this case, the copyright owner, DAISA, and Lladro USA failed to establish that the importation into the United States was "without the authority of the owner of the copyright." Because the undisputed facts establish absence of that element, Costco was entitled to summary judgment.
 
 
 31
 Costco and Appellees both seek attorneys' fees for this appeal under 17 U.S.C. § 505. We have discretion to award them. Fogerty v. Fantasy, Inc., 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994); Jackson v. Axton, 25 F.3d 884, 890 (9th Cir.1994). Attorneys' fees are awarded in favor of Costco, in an amount to be determined by the district court.
 
 
 32
 The judgment of the district court is REVERSED, and on REMAND judgment should be entered in favor of Costco.