Marilyn CARANO a/k/a Lynn Carano d/b/a Lynn Carano Graphics, Plaintiff,

v.

VINA CONCHA Y TORO, S.A., Banfi Vintners, Barbara Long d/b/a Leapfrog Brand Strategies and Marie Greener d/b/a Greener Group Defendants.

No. 01–CV–5865(CLB)(GAY).

United States District Court, S.D. New York.

Jan. 28, 2003.

Nicholas L. Coch, Norman C. Simon, Kramer Levin Naftalis & Frankel LLP, New York City, for Defendants Barbara Long and Marie Greener.

Richard D. Rochford, Jr., Michael Orman, Kristen M. Walsh, Nixon Peabody LLP, Rochester, NY, for Defendants Banfi Vintners and Vina Concha y Toro, S.A.

Robert Hilpert, Steven Felsenfeld, Bradley Rubin, Croton, NY, for Plaintiff Marilyn Carano a/k/a Lynn Carano d/b/a Lynn Carano Graphics.

### Memorandum and Order

BRIEANT, District Judge.

There are before the Court for resolution the following motions, all of which were heard and fully submitted for decision on December 13, 2001. The motions are listed in their order of filing:

Document 53 by Barbara Long, Marie Greener, etc, for Summary Judgment dismissing Plaintiff's complaint and for Summary Judgment on their counterclaim, filed November 27, 2002.

Document 55 by Banfi Vintners and Vina Concha Y Tora for Summary Judgment dismissing the complaint, filed September 27, 2002.

Document 63 by Marilyn Carano for partial Summary Judgment in favor of Plaintiff on the issue of infringement as to Defendants Vina Concha Y Toro and Banfi Vintners, filed October 28, 2002.

Document 67 by Barbara Long and Marie Greener for Summary Judgment dismissing the cross claims of Defendants Vina Concha Y Toro, S.A. and Banfi Vintners, filed November 12, 2002.

This is an action for copyright infringement brought by Marilyn Carano a/k/a Lynn Carano doing business as Carano Graphics, on June 27, 2001. The Court has subject matter jurisdiction under 28 U.S.C. 1338, Vina Concha Y Toro is a corporation existing in, and under the laws of Chile, which makes and exports wine under the brand name Concha Y Toro, loosely translated as "shell and bull". Defendant Banfi Vintners, Inc. is the importer and distributor of Concha Y Toro and of other wines made by other wine makers. For convenience, we refer to Vina Concha Y Tora, and Banfi Vintners simply as Banfi, unless the context indicates otherwise. Defendant Barbara Long does business as Leapfrog Brand Strategies ("Leapfrog"). The co-defendant Marie Greener does business as Greener Group, Inc. Leapfrog describes itself as "a consumer research and brand strategy consulting business". Marie Greener apparently is in the same or similar business as Leapfrog and the two organizations have collaborated to perform services for various manufacturers and wholesalers of packaged products.

The standards for granting Summary Judgment are so well known as not to require repetition. There are no disputed issues of material fact in this case, although the legal consequences flowing from the facts are hotly contested. The relevant facts are as follows.

Banfi also is the American distributor for another group of wines sold under the name of Riunite, and, in 1999, Banfi retained Leapfrog to analyze consumer perceptions of the Riunite Brand and to propose improved merchandising techniques, including improved packaging. A specialty of Leapfrog is the use of so-called "focus groups" which involves obtaining a panel of persons, a cross-section of the community, to evaluate the products, their names and packaging and express their reactions to existing packaging and merchandising as well as to possible changes and improvements. The project concerned research to understand the public percep-

tion of the Riunite Brand and the identification of future opportunities for enhanced sales. These marketing services were performed without a written contract, and eventuated to the satisfaction of the account executive at Banfi, although written contracts are the customary means by which Banfi accomplishes similar work. Leapfrog associated Greener with this project and Ms. Long and Ms. Greener worked directly with Banfi representatives. Long and Greener describe their work output as a "Deliverable".

In connection with the Riunite project, neither Long nor Greener informed Banfi that they worked with a third party to create visual imagery for their consumer exploratory work with the focus groups. In fact, they did so and they had, in connection with the Riunite project, retained Plaintiff, a graphic artist who works independently, as an independent contractor to develop depictions of the Riunite name in various styles, typefaces and colors which were exhibited to the focus groups by Long and Greener in connection with their work for Banfi. Although the Deliverable for Riunite included visual depictions of the Riunite name in various styles and colors, none of them were actually used by Banfi.

Pleased with the work done by Leapfrog and Greener for Riunite, Banfi retained Leapfrog to do similar work in connection with its line of Concha Y Toro wines (the Concha Y Toro Project). This retainer was also oral, but it was the expectation of Banfi that Leapfrog would be associated with Ms. Greener in preparing the Deliverable and that the scope of the work would be similar to that actually done for Banfi by the same Defendants in connection with Riunite. Banfi anticipated that the same graphic artist who had worked on the Riunite project, or somebody similarly situated would be employed by the Leapfrog-

Greener joint venture to produce visual art as part of the Deliverable, just as had been done with the Riunite project.

The July 13th, 1999 presentation, made to Banfi by Leapfrog, outlines the Concha Y Toro Project in the peculiar argot known to those engaged in marketing research. Leapfrog undertook to "define and dimensionalize brand equities among (Banfi's) current consumers and understand the role of the sub-brands (sub-brand names omitted)" and to "identify leverageable company values, heritage and lore." Leapfrog undertook to "define and map the competitive landscape and to identify opportunities for the brand tomorrow." Included also was an undertaking to "identify untapped life style values and desires that can be linked to the brand opportunity"; "explore the opportunity to own the best of Chile imagery linked to wine" and "develop a range of potential brand positionings". Leapfrog described its efforts as including a four stage process: Discovery; Hypothesis Development; Consumer Exploratory; and Strategic Vision. It promised that "from this approach, we will clearly define an ownable brand positioning and vision with directional tactics to build momentum, engage and sustain customers over time." Familiarity of the reader with the initial presentation of Leapfrog to Banfi in connection with the Concha Y Toro Project is assumed. There was no undertaking therein to design a logo for the brand, and no discussion whatever concerning ownership of the intellectual property rights flowing out of the work.

With the approval of Banfi and without a written contract, Long and Greener went to work and retained Plaintiff to help them as a graphic artist. Ultimately, Leapfrog was paid $95,927.26, which it shared with Greener, by Banfi for the Deliverable dated October 25, 1999 found as Exhibit 9

attached to Document 58 on the Motion. Of this sum, they paid $3,289.11 to Plaintiff Marilyn Carano for her part in the effort..

To earn her fee, Ms. Carano, at the direction of Long and Greener, drew, and revised, a picture of a shell similar to that of a snail, and took from "clip art" in the public domain, the head of a Bull, to express the concept of "shell and bull". It is the alleged copying of this rendition (upon which Ms. Carano later obtained a copyright registration without designating it as a derivative work from the clip art) that is the basis of this lawsuit.

Leapfrog showed the drawing, along with some other labels and graphics, which are not in dispute, to its focus groups and, in its Deliverable of October 25, 1999, included a copy of the graphic prepared for Leapfrog and Greener by Ms. Carano, along with a recommendation that Banfi "own an invocative shell and bull icon that visually distinguishes the brand," and "develop powerful iconography for the brand."

Greener testified, and this fact is apparently confirmed by all other participants, that Leapfrog did not recommend or expect that Banfi would simply take and use the shell and bull design set forth in the Deliverable, but rather would treat it as a sample rendering of a strategic area to be developed by others (Greener deposition at 219).

Much of the advice in the Deliverable was very basic. For example, Banfi was told by Long and Greener that "Sunrise name (a sub-brand of Concha Y Toro) clearly says morning, and is a disconnect with wine; more suited to orange juice, breakfast food." There are numerous other examples in the Deliverable, some of which show that people retain consultants to tell them that which they ought to know without being told. The Deliverable told Banfi that Concha evokes an archetype of "the feminine watery principle; the universal magic; birth, regeneration, life; love; marriage; fertility; the life-giving female 'yin'; a good life, a journey across the sea; the two halves being closely held together in passion", while Toro evokes the archetype of "masculine principle in nature; the solar generative force sacred to all sky gods; male procreative strength; royalty; a king; the roaring bull symbolizes thunder, rain and fertility" (Exhibit 9 at B001631). On the following page of the Deliverable, the consultants presented Ms. Carano's rendering of the bull and the shell, with the bull on the left side of the shell, as an "integrated brand icon, telegraphic and timeless". The consultants wrote "the mystery and magic of the name come to life with an evocative, suggestive icon that integrates the dual principles of the shell and the bull" (Page B001632).

Familiarity of the reader with the balance of the Deliverable is assumed. Clearly, it is an invitation to the client to adopt, as an icon, a simple replication of a shell and a bull, and although the word logo appears nowhere in the Deliverable, the Concha Y Toro drawing is reproduced again at B0001648 under a heading "Universal Appeal" and described as "distinct and evocative, defines the name, evokes a compelling brand mood and spirit, a powerful highly appealing icon that fits the name of a distinct Chilean wine". Beginning at Page B0001649, other possible icons were presented and described as "supportive but not ownable". These include the name superimposed over a bunch of grapes, the name using the Y in the middle of the name to evoke two peaks of the Andes, as well as two modern drawings, one of a wine glass on Page B01650 regarded as "relevant but lacked stature". Other labels are included for all of the different Concha Y Toro wines, with differ-

ent forms of typeface, including some which were marked "rejected".

Nowhere in the Deliverable is a symbol attached to the Plaintiff's drawing indicating it is copyrighted, and the Deliverable itself is not copyrighted and bears no sign of such. The parties clearly regarded the various icons suggested, including the shell and the bull, as preliminary and mere suggestions. The Defendant consultants were recommending that Banfi develop powerful iconography, and that the idea of the shell and the bull be used to do so, but neither they nor Banfi regarded Plaintiff's work as a final design. Rather it was submitted to the client as a sample rendering of the "strategic area to be developed" (Greener deposition at 219).

Banfi thereafter retained Muts & Joy, an unrelated package design firm to develop a Concha Y Toro master brand signature and to portray the meaning of the Concha Y Toro name (Shell and Bull). It is conceded that Muts & Joy attended the presentation of the Deliverable, and that a copy which contained the Plaintiff's work was turned over the Muts & Joy.[1]

Thereafter, Banfi paid Muts & Joy approximately $150,000.00 to create the logo of the shell and the bull actually used on the wine bottles of Concha Y Toro. See Exhibit 8 to Document 75, Declaration of Kristin M. Walden. The appearance of the logo as ultimately created by Muts & Joy is somewhat different. The shell is superimposed over the bull and is on the left of the bull from the purchaser's viewpoint, rather than on the right as originally submitted by Leapfrog. It is rendered in black and brown with a white frame, while the Deliverable was submitted in black and white without a frame. The proportions of height to width are also different. Concha

Y Toro filed the shell and the bull as developed by Muts & Joy, as a trademark first used on April 20, 2000.

### *Discussion*

■ Common sense suggests that if, for no other reason, the Complaint must fail because Banfi paid a substantial fee for which it received an implied non-exclusive license to develop the icon through its consultant, Muts & Joy. The procedures followed in this case by Leapfrog and Greener are customary in marketing research. All parties, including Plaintiff, knew the scope of Leapfrog's retainer by Banfi and they knew that the intellectual property comprised within the Deliverable would be passed on to Banfi at the conclusion of the Project and after payment of the fee, with the intention that others would be retained as, in fact, happened with Muts & Joy, to adapt and use the ideas for which Leapfrog was well paid by Banfi. Ms. Carano knew at all times for what the work was being used. She did not seek copyright registration until long after the event (August 8, 2000), and nothing on the drawing submitted to Banfi as part of the Deliverable indicates any intention to copyright the work.

Undisputed deposition testimony confirms that the *idea* of the shell and bull, which is not in itself protected by copyright, was conceived by Long and/or Greener to be recommended for development as an icon for Concha Y Toro wines. The bull, as noted earlier, was clip art in the public domain and the shell was drawn and re-drawn by Plaintiff under the direction of Long and Greener. It is highly likely under these circumstances that, were the case to be tried, any rational jury would have to conclude that Long and

---

1. Plaintiff has sued Muts & Joy and others for copyright infringement under Docket 02 Civ 3390(CLB), filed May 26, 2002. That action has been stayed pending the outcome of this litigation.

Greener were co-authors of the work, but whether or not this is so is of no concern. Ms. Carano did the work at the request of Long and Greener knowing that it was to be submitted as part of the Deliverable, and used by Banfi and she was paid for what she did. She did not assert any copyright claim in the matter, nor did she mark the work as copyrighted. The totality of her actions, and those of Long and Greener are sufficient to grant Banfi a non-exclusive implied license.

The commercial practices followed in this case are, as noted earlier, quite common and therefore it is of note that the issue presented does not seemed to have arisen in many cases. It is clear that Banfi requested the creation of the Deliverable, which was reasonably expected to include one or more recommended icons. Ms. Carano knew this, and delivered the work to Long and Greener as intermediaries for Banfi, and is presumed to have intended, on the totality of the circumstances, that the licensee-requestor (Banfi) would copy and distribute the work, *I.A.E. Incorporated v. Shaver*, 74 F.3d 768, 776 (7th Cir.1996), *Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558–59 (9th Cir.1990), *Holtzbrinck Publishing Holdings, L.P. v. Vyne Communications, Inc.* (S.D.N.Y. 97 Civ. 1082—not officially reported).

In *I.A.E. Incorporated, supra*, a factual context very similar to this case was presented. An architect, Shaver, copyrighted design drawings he had prepared for a joint venture which, in turn, had contracted to design and construct an air cargo/hangar building for a Regional Airport Authority. The joint venture hired the architect as an independent contractor for a sum certain to prepare the drawings. Unlike Ms. Carano, Mr. Shaver submitted his drawings with a notice of copyright attached. The Court noted that, as in this case, the copyright holder "created a work at Defendant's request and handed it over intending that Defendant copy and distribute it (*Id.* at 772) and was paid a fee for doing so", resulting in an implied non-exclusive license to the Defendant to use its work. The Court of Appeals quoted with approval the conclusion of the District Court:

As a matter of law only one conclusion can be drawn from these undisputed facts: 'Shaver [the copyright holder] granted the airport a non-exclusive license to use his drawings as the basis for preparing working drawings and completing the project. Shaver's argument that the Airport can use the drawings only as pieces of paper (wall hangings?, placemats?) is untenable' (quoted from 74 F.3d 768 at 772).

Distinguishing between an exclusive license which by statute must be in writing, the Court held that a non-exclusive license may be implied from conduct, and, against a factual background very similar to the instant case, held that it was. Indeed, the instant case is in a way stronger than *I.A.E. Incorporated* because the disputed drawing in this case contains no copyright notice; Shaver had clearly marked his design drawings as copyrighted.

*Holtzbrinck, supra* involves the creation of the Scientific American website for a substantial payment pursuant to an oral agreement. Assuming that parties failed to satisfy the requirements of the Copyright Act to support a finding of express license, the Court held that, having paid for the development of the work, *Holtzbrinck* was entitled to an irrevocable non-exclusive license to use the programs and files comprising the website. Relying on *Graham v. James*, 144 F.3d 229, 235 (2d Cir.1998), the Court, in *Holtzbrinck*, held that an implied non-exclusive license is granted when a person, the licensee, requests the creation of a work, the creator,

the licensor, makes that particular work and delivers it to the licensee with the understanding that the licensee will copy and distribute the work.

Accordingly, this Court concludes as a matter of law that Banfi and Concha Y Toro at the very least, possess a permanent implied non-exclusive license to use the work.

■ As an alternative ground, the Court concludes that the conceded facts suggest that Long and Greener were co-authors of the work. By delivering the work to Banfi in return for a substantial payment and without any warning that a copyright would be claimed adversely to Banfi after Banfi used what it paid for, Long and Greener should be found as a matter of law to have consented to an implied non-exclusive license of the work in favor of Banfi. Their consent as co-authors binds the Plaintiff.

■ We leave the issue of implied license and turn to a closer question presented, and that is: Does the logo as finally used by Concha Y Toro infringe the work of Plaintiff submitted as part of the Deliverable?

Ordinarily, Courts confronted with infringement begin with the issue of access, and finding access, infer from the infringing work and the copyrighted work set down side-by-side, that there must have been copying because of the similarities of the respective works. Here, in this case, there is no question about access, because, as noted earlier, Muts & Joy attended the presentation of the Deliverable to Banfi with the express purpose, as recommended by Long and Greener, of reworking the idea of the icon recommended by Leapfrog to Banfi, so that it would be commercially usable as a trademark.

It was the conceded purpose of Muts & Joy to present something "close to the research". (See Exhibit C to Document 75). There are just so many ways to present the concept of a bull and the initial presentation was done with clip art in the public domain. The bull, as presented in the Deliverable, is a mere outline, intentionally foggy, showing large horns characteristic of a Texas Longhorn with a wider head of the sort attributable to a Holstein–Friesian. As finally presented by Muts & Joy, the bull's head is somewhat darker and the horns somewhat flattened. In the Plaintiff's work, the shell appears to the right of the bull and is not clearly delineated from the bull's face. In the Muts & Joy logo, the shell appears on the observer's left and the bull appears on the right. This is consistent with the order in which the shell and bull appear in the name. The shell is distinctly rendered, so as to appear on a different visual plane than the bull's head and extends slightly over the edge of the border. We are told that some of the members of the focus group found the bull originally depicted as aggressive and threatening. This is not the Court's impression but a reasonable person might think so. In the Muts & Joy rendition, the bull probably appears less ominous and the bull's head is level rather than tilted. Joy Greene, a principal of Muts & Joy, testified that the balance between the bull and shell elements was materially different, and that the total impression between the two works is entirely different. This Court agrees.

A conclusion of non-infringement follows when an ordinary observer would determine that the total concept and feel of the two works is different. Such differences may result from lighting, shading and color. *See, e.g. Kaplan v. Stock Market Photo Agency*, 133 F.Supp.2d 317, 321–28 (S.D.N.Y.2001) (photographs of a man standing on the ledge of a tall building held not to be infringing because of differ-

ent moods being perceived by the observer as a result of differences in lighting, shading and color). See also *Kerr v. New Yorker Magazine, Inc.*, 63 F.Supp.2d 320 (S.D.N.Y.1999) (two drawings of a man with a Mohawk haircut with a Manhattan skyline superimposed did not infringe because of a difference in the contours and a different positioning of the man's head). The Court concludes that the Muts & Joy logo is sufficiently different from Plaintiff's work, by which it was clearly inspired, as to be non-infringing because it conveys a different impression.

The Court agrees with Defendants that the State law claims pleaded against Concha Y Toro and Banfi must be dismissed because they are preempted by the Copyright Act. Finding no infringement, this Court need not reach the issue of whether the copyright registration is invalid because it fails to disclose the use of the clip art, and Defendants lack standing to assert invalidity, absent infringement.

The motions by Defendants for Summary Judgment dismissing the Complaint both are granted. The Motion of Plaintiff for partial Summary Judgment on the issue of infringement is denied. So much of the Motion by Defendants Long and Greener, which seeks Summary Judgment on the counterclaim, is denied. The cross claims are dismissed without prejudice.

The Clerk shall file a final judgment.

SO ORDERED.