# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-11297
c/w No. 14-10365

United States Court of Appeals
Fifth Circuit

**FILED**

June 15, 2015

Lyle W. Cayce
Clerk

MARSHALL HUNN, Agent of Hunn Designs,

Plaintiff – Appellant,

v.

DAN WILSON HOMES, INCORPORATED; DAN WILSON; BEN J. LACK,

Defendants – Appellees.

Appeals from the United States District Court
for the Northern District of Texas

Before DAVIS and ELROD, Circuit Judges.*

JENNIFER WALKER ELROD, Circuit Judge:

Appellee Ben Lack, who was employed as a draftsman at Appellant Marshall Hunn's architectural design firm, resigned from his position while in the middle of a project for Hunn's client, Appellee Dan Wilson Homes. After Lack resigned from Hunn's employ, Dan Wilson hired Lack to complete the project. Hunn, alleging that Lack and Wilson secretly agreed to this arrangement in advance—*i.e.*, that Lack and Wilson secretly agreed to cut Hunn out of the business relationship—brought numerous claims against Lack

---

* This opinion is being entered by a quorum of this court pursuant to 28 U.S.C. Section 46(d).

13-11297 c/w 14-10365

and Wilson. The district court granted summary judgment to Lack and Wilson on many of the claims and, after a bench trial, ruled in favor of Lack and Wilson on the remaining claims. Because the district court did not clearly err in finding that Lack and Wilson never made the alleged secret agreement, and because Hunn's legal theories lack merit, we AFFIRM.

## I.

Dan Wilson is the owner and president of Dan Wilson Homes, Inc., which is a custom home construction company.[1] As relevant here, Wilson contracted with Hunn Designs, an architectural design firm owned by Marshall Hunn, to produce plans for four custom homes.[2] Wilson hired Hunn's firm because he wanted the plans to be drafted by Ben Lack, who was employed on an at-will basis by Hunn.[3]

Wilson and Hunn agreed to a fee amount of $1.25 per square foot of air-conditioned living space for plans drafted by Lack. Wilson made clear to Hunn that Wilson would be directing the design work as requested by his clients/homeowners and would not need any pre-designed plans from Hunn. Hunn's responsibilities were to provide quality plans in a timely manner for Dan Wilson Homes to use to build the custom homes. Lack was to draft the plans as directed by Wilson and the homeowners. Wilson's responsibility under the parties' agreement was to pay for the plans.

---

[1] The facts recounted here are the facts as found by the district court, some of which are disputed by Hunn.

[2] We refer to these four plans as the Jeffers plan, the Winder/McGee plan, the Brown plan (after the last names of the clients), and the Showcase plan (which was a plan designed for an annual local builders' showcase event).

[3] The parties' arguments do not distinguish between the individuals and their businesses; accordingly, we use "Wilson" and "Dan Wilson Homes" interchangeably, and we do the same with "Hunn" and "Hunn Designs."

2

Lack was the only Hunn employee who worked on the four custom plans for Dan Wilson Homes, and Lack served as a representative for Hunn Designs at weekly meetings with Wilson and the homeowners.  At these weekly meetings, Lack delivered paper copies of the plans to Wilson and the homeowners.  After Lack commenced work on all four of the plans—but before he completed any of the plans—Lack decided to resign from his position at Hunn Designs.  On October 5, 2011, Lack informed Hunn of his desire to resign.  Hunn and his wife initially feared that Lack had agreed to work in-house for Dan Wilson Homes, but the next day, Lack told Wilson that he had no job offer from Dan Wilson Homes.  Hunn, upon hearing that Lack did not have an offer from Wilson, asked Lack to take the weekend to consider his options, and Lack continued to work for Hunn on that day and also the next day (Friday) from the office and home.

During this period, Lack believed that even if he gave official notice of his intent to resign from his employment with Hunn, he would be expected and permitted to continue working for two more weeks before his employment ended.  Thus, Lack believed and intended that he would be able to complete the Wilson projects during his remaining two weeks of employment with Hunn.  Indeed, Lack notified Wilson that he was considering resigning, but assured Wilson that he (*i.e.*, Lack) intended to complete the drafting of Wilson's plans (as an employee of Hunn's).

Over the weekend, and still under the impression that he would be allowed to continue working at Hunn Designs on the projects he had been assigned, Lack requested by email that a friend of his convert some of the Wilson project (virtual) files from the 2008 version of AutoCAD to the 2006 version.  This conversion was required because Lack maintained his own copy of AutoCAD software on his home computer in the 2006 version and the version at Hunn's offices was the 2008 version.  Hunn permitted draftsmen to take

files home because draftsmen often worked on projects on their own home computers as well as on the work computers contained in Hunn's office. Hunn does not dispute that Lack had permission to work on the files at home and was expected to do so in order to ensure timely completion of projects.

After an exchange between Lack and the Hunns on the morning of Monday, October 10, 2011, relating to Lack's decision about whether he would remain employed at Hunn Designs, Lack was asked to discontinue employment immediately. The Hunns asked Lack to return the Dan Wilson Home project (physical) files, which were at Lack's house. The Hunns did not ask Lack to return the AutoCAD (virtual) files. Lack retrieved the physical files and then cleaned out his office and left Hunn Designs.

When Lack's employment with Hunn ended, the home plans at issue were not yet completed. At that time, the Winder/McGee and Brown plans were approximately 90–95 percent complete, the Jeffers plan was approximately 30–40 percent complete, and the Showcase plan was only at the hand-sketch stage. At the time Lack's employment ended, Wilson had physical drafts of all four plans in the same stage of completion as those Lack maintained on his computer. Nothing new had been added to the plans between the time when Lack delivered the latest version of the plans to Wilson and the day when Lack resigned.

Upon learning that Lack was no longer employed with Hunn, Wilson asked Hunn who would be completing the custom home plans and when the completion could be expected. Hunn, who was angry with Wilson for what he perceived as a secret plan between Wilson and Lack for Lack to become employed by Dan Wilson Homes, informed Wilson that he (*i.e.*, Hunn) did not know when he could complete the plans because he was busy on other projects. The Hunns also suggested that the draft plans were their property and that Wilson would violate copyright laws if he used the copies of the plans he had

4

in his possession to complete the homes for his clients. Wilson proposed several ideas to Hunn about how the plans could timely be completed, including: (1) bringing the drafts in their then-current states of completion to Hunn to complete; (2) Hunn employing Lack a short time more so that Lack could finish the plans; (3) offering to pay for the percentage of completion in which the drafts stood in relation to the fully completed contract amount; and (4) offering to have the plans finished and then brought back to Hunn so that Hunn could copyright them to alleviate Hunn's contentions about asserted copyright claims. Hunn, however, rejected all of the ideas. Mrs. Hunn informed Wilson that he should hire an attorney, and the Hunns' attorney sent a letter to Wilson that included a statement that "the ability of Hunn to complete the existing designs" had been impaired. Hunn later applied for copyright protection on the plans, even though he had never before registered or applied for copyrights on any other set of home plans.

Wilson, after failing to convince Hunn to accept one of his proposals and receiving the letter from the Hunns' attorney, asked Lack to complete the plans. At the time Wilson asked Lack to complete the plans, Wilson was unaware of any non-compete clause Lack may have entered into with Hunn. Both Wilson and Lack believed that the plans were the property of the homeowners because the designs were based on the homeowners' ideas and concepts. Lack completed the four plans for Wilson, using the (virtual) files his friend had converted to the 2006 version of AutoCAD.

Wilson tendered payment to Hunn on a pro-rated basis for the work that Lack had performed while still employed by Hunn. After Hunn refused to accept the payment, Wilson tendered payment in the full contract amount, which included work that had not ever been performed by Hunn. Hunn again refused to accept payment. Instead, on May 24, 2012, Hunn filed suit in the Northern District of Texas against Wilson, Dan Wilson Homes, and Lack,

alleging, *inter alia*, that Wilson and Lack secretly agreed that Lack would leave Hunn's employ, misappropriate Hunn's property, and steal Hunn's business. Hunn's second amended complaint contains eight causes of action: (i) copyright infringement under 17 U.S.C. § 101 *et seq.*, against all Appellees; (ii) false designation of origin under 15 U.S.C. § 1125 (Lanham Act), against all Appellees; (iii) breach of contract, against Dan Wilson and Dan Wilson Homes; (iv) breach of fiduciary duty, against all Appellees; (v) breach of covenant not to solicit customers, against Ben Lack; (vi) tortious interference, against Dan Wilson and Dan Wilson Homes; (vii) computer fraud and abuse under 18 U.S.C. § 1030(g), against all Appellees; and (viii) conspiracy, against all Appellees.

The district court granted summary judgment for Dan Wilson and Dan Wilson Homes on Hunn's Lanham Act claim, breach of fiduciary duty claim, tortious interference claim, computer fraud and abuse claim, and conspiracy claim. The district court granted summary judgment for Lack on Hunn's Lanham Act claim, computer fraud and abuse claim, breach of covenant not to compete claim, and conspiracy claim. Hunn appealed from the summary judgment order on his breach of fiduciary duty claim against Dan Wilson and Dan Wilson Homes, his computer fraud and abuse claim against Lack, his breach of covenant not to compete claim against Lack, and his Lanham Act claims against all Appellees. While the appeal was pending, the district court held a bench trial on the remaining claims. After the bench trial, the district court entered a judgment in favor of Appellees on all counts[4] and also awarded attorney's fees to Appellees. Hunn appealed from the judgment on his breach of fiduciary duty claim against Lack, his copyright infringement claim against

---

[4] Dan Wilson and Dan Wilson Homes asserted counterclaims against Hunn for copyright misuse and copyright infringement, on which the district court ruled in Hunn's favor. Wilson did not appeal from this portion of the judgment.

all Appellees, his breach of contract claim against Dan Wilson and Dan Wilson Homes, and on the attorney's fees award.  We consolidated the two appeals.

## II.

## A.

We begin with Hunn's claims for breach of contract against Dan Wilson and Dan Wilson Homes.  "The elements of a claim for breach of contract are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Foley v. Daniel*, 346 S.W.3d 687, 690 (Tex. App.—El Paso 2009, no pet.).  After trial, the district court ruled in favor of Appellees on this claim, for several reasons.  First, Wilson did not breach the contract because his only duty under the contract was to pay the agreed-upon sum, and Wilson tendered that sum to Hunn.  Second, Wilson's obligation to pay arose only after Hunn performed his contractual obligation of delivering a completed plan, which Hunn not only failed to do, but refused to do.  Third, Wilson was excused from performance by Hunn's anticipatory breach of the contract, which was evident from "Hunn's statement to Wilson that he did not know when he could get to the plans to finish them, the lecture from Mrs. Hunn directed at Wilson, and the letter received by Wilson from Hunn's attorney."

On appeal, Hunn disputes the district court's finding that Wilson and Lack did not enter into a "secret agreement" whereby Lack would resign from Hunn Designs and begin to work directly for Wilson.  Hunn claims that Lack and Wilson reached an "agreement **during** Lack's employment with Hunn" and that the evidence "permit[s] no other plausible explanation."  According to Hunn, this secret agreement "precluded Hunn from performing the [Hunn-Wilson] agreement, from meeting with Wilson's clients, and from completing the [Hunn-Wilson] agreement."  We review the district court's factual findings

7

for clear error. *Arete Partners, L.P. v. Gunnerman*, 594 F.3d 390, 394 (5th Cir. 2010).

The district court's finding that no "secret agreement" existed was not clearly erroneous. Wilson testified that he did not want Lack to resign from Hunn's employ, that he did not offer Lack a job at Dan Wilson Homes, and that he never promised to hire Lack to finish the four plans at issue in this case while Lack was still an employee of Hunn's. Likewise, Lack testified that he and Wilson never agreed to work together after Lack resigned and that, at the time Lack resigned, he did not have a job offer from Wilson. The district court found Lack's testimony to be credible on this specific point. *See, e.g., Orduna S.A. v. Zen–Noh Grain Corp.*, 913 F.2d 1149, 1154 (5th Cir. 1990) ("The credibility determination of witnesses . . . is peculiarly within the province of the district court."). In light of this credible testimony, the district court's finding was not clearly erroneous.

Hunn points to two pieces of evidence that he claims undermine the district court's finding. First, he cites two trial exhibits showing that Lack invoiced Wilson on October 18, 2011 for work Lack did on the Showcase plan. Hunn argues that Lack's completion of the Showcase plan just seven days after resigning from Hunn's employ establishes that Lack and Wilson had a prior agreement and, therefore, that their testimony was not credible. We disagree that the timing of the project's completing compels this conclusion. While the fast turn-around on the project is evidence from which a factfinder *could have* drawn an inference that a prior agreement existed, the district court did not clearly err by drawing a different inference based on the testimony and other evidence.

Second, Hunn claims that Lack admitted in his deposition that he and Wilson reached a prior agreement. The deposition testimony in question is as follows:

8

> **Q:** [When you sent the AutoCAD files to have them converted to the 2006 version], you at that time had an agreement or understanding with Dan Wilson that you would continue to work and finish the drawings?
> **A:** Yes. I would, yes.
> **Q:** And he agreed to that?
> **A:** I believe so, yes.
> . . .
>
> **Q:** So you felt you were free to take those CAD drawings and finish them?
> **A:** They were due monies for work completed, yes. So, as it was agreed that between me and Mr. Wilson that they would be paid for the work that they . . . had done on those plans . . . .
> **Q:** So you had an understanding before you even left Hunn Designs that they would be paid at the rate of $1.25 or whatever the rate was?
> **A:** Yeah, whatever their invoiced rate was.

Neither of these exchanges compel the conclusion that a prior agreement existed. The first exchange is consistent with the conclusion, reached by the district court, that Lack agreed to finish the drawings *as an employee of Hunn's.* Indeed, when Hunn's attorney questioned Lack during trial about this exchange, Lack explained that he believed he would be permitted to work for Hunn for two weeks after tendering his resignation (*i.e.*, after giving his "two-week notice"). Accordingly, when Wilson expressed concern about whether Lack would be able to finish the plans, Lack assured Wilson that he intended to finish the plans in his final two weeks of employment. The district court credited this version of events, explicitly finding that "Lack's statement referring to an agreement to complete the plans for Wilson related directly to Lack's belief that he would be able to do so while still employed by Hunn and after giving his two weeks' notice." The second exchange also is consistent with the district court's finding that Lack agreed to finish the drawings as an employee of Hunn's. During the exchange, Lack, using the pronoun "they,"

agrees that *Hunn Designs* was entitled to payment for the plans. Thus, this exchange actually cuts against Hunn's theory of the case, which is that Lack had agreed to finish the plans for his own personal financial gain. In any event, it does not appear that this deposition exchange was introduced at trial. *See generally* Fed. R. Civ. P. 32 (setting forth requirements for using deposition testimony at trial).

Hunn has not shown that the district court clearly erred in rejecting Hunn's claim that Lack and Wilson "entered into a secret plan to steal Lack away from Hunn for employment by Dan Wilson Homes." Accordingly, we will not disturb the district court's ruling in favor of Appellees on Hunn's breach of contract claim.

**B.**

We now turn to Hunn's claim that Lack breached his fiduciary duties by disclosing confidential information (*i.e.*, the unfinished plans) to Wilson and that Wilson knowingly participated in Lack's breach. "The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 479 (Tex. App.—Dallas 2010, no pet.). Fiduciary duties generally terminate at the end of an employment relationship, but an "agent has a duty after the termination of the agency not to use or to disclose to third persons . . . trade secrets . . . or other similar confidential matters . . . ." *NCH Corp. v. Broyles*, 749 F.2d 247, 254 (5th Cir. 1985) (second and third alterations in original) (internal quotation marks omitted). "[W]here a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942).

13-11297 c/w 14-10365

After trial, the district court ruled that Lack did not breach any fiduciary duties to Hunn because Lack's fiduciary relationship to Hunn "ended upon the termination of his employment" and because, after his employment ended, Lack "did not disclose trade secrets or confidential information." The district court acknowledged that Lack finished the plans for Wilson by using the AutoCAD files he had created while working for Hunn.[5] However, the district court found that the plans in the AutoCAD files were the same as the physical copies of the plans that "already been disseminated by Hunn Designs, by way of its agent Lack and with full knowledge of Hunn himself, to Wilson and the homeowners." Because the AutoCAD plans Lack used to complete the project for Wilson had already been delivered to Wilson, the district court found that "the partially completed plans (whether paper or electronic) were not maintained as confidential information." *Cf. Furr's, Inc. v. United Specialty Adver. Co.*, 385 S.W.2d 456, 459 (Tex. Civ. App.—El Paso 1964, writ ref'd n.r.e.) ("The owner of the secret . . . will lose his secret by its disclosure . . . .").

On appeal, Hunn cites *Taco Cabana International, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113 (5th Cir. 1991), for the proposition that a limited disclosure of architectural plans does not extinguish their secrecy. However, *Taco Cabana* stands only for the proposition that disclosure of confidential information to a particular person does not extinguish the information's confidentiality *as to other people*. *Id.* at 1124. Here, on the other hand, the party to whom the paper plans were disclosed (*i.e.*, Wilson) is the same party to whom the virtual plans were later disclosed. Information that has already been disclosed to a party cannot be confidential as to that same party. *See*

---

[5] Hunn stresses Lack's admission that Lack, after he left Hunn's employ, used the AutoCAD files he had originally created while working for Hunn. This fact does not appear to be disputed by anyone, and the district court did not find otherwise.

11

*Phillips v. Frey*, 20 F.3d 623, 630 (5th Cir. 1994) ("[I]t is not improper to obtain knowledge of a process where the holder of the alleged trade secret voluntarily discloses it . . . ."); *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir. 1986) ("[A] substantial element of secrecy must exist, so that except by the use of improper means, there would be difficulty in acquiring the information." (internal quotation marks omitted)).   Thus, Hunn can only prevail if the different forms of the plans (virtual and physical) differed in a meaningful way, and if the district court clearly erred by finding that they did not.

Hunn insists that the virtual plans were meaningfully different from the physical plans because the AutoCAD plans were "kept under lock, key, and password."   However, keeping one copy of the plans under lock, key, and password does not change the nature or substance of the plans.   If Wilson already possessed identical plans, it is of no consequence that another copy of the same plans was locked up somewhere else.   The distinction between the virtual plans and the physical plans only is a meaningful one if the former contain additional information not available to (*i.e.*, kept confidential from) Wilson. *Cf. Greenberg v. Nat'l Geographic Soc'y*, 533 F.3d 1244, 1257 (11th Cir. 2008) (noting, in the copyright context, "that a difference in form is not the same as a difference in substance").   Hunn, in his briefing to us, does not cite *any* evidence of relevant differences between the two formats, nor does he cite *any* evidence that the virtual files contained information or metadata that the physical files did not.   His failure to cite any such evidence is determinative. *See Messer v. Meno*, 130 F.3d 130, 135 (5th Cir. 1997) ( "TEA's failure to cite . . . the record not only waives this complaint on appeal but demonstrates the lack of evidence in the agency's favor.").

In any event, our independent review of the trial testimony reveals only a snippet of testimony by Hunn about AutoCAD's "layers" feature, which

allows the drafter to "separate elements of a drawing." Hunn testified that the layers feature can be beneficial, "[i]f your AutoCAD is set up that way," because "[y]ou can turn those layers on and off to display [only] the information that you would like to display." Even if this feature were enough to make a difference,[6] there is no evidence that the AutoCAD files in this case were "set up that way" or that Lack utilized layers in drafting the four plans at issue here. Nor did Hunn testify that the AutoCAD files in this case contained hidden layers that were not visible on the physical plans delivered to Wilson. Without any evidence on the point, we cannot just assume that the AutoCAD files were substantively different from the physical files, and we certainly cannot say that the district court clearly erred by finding that they were the same. *See, e.g.*, *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 748 F.3d 583, 604 (5th Cir. 2014) ("Courts . . . must base decisions on facts, not hypothesis and speculation.").

Moreover, even assuming *arguendo* that the manipulability of AutoCAD files could make the files "confidential," the record contains conflicting evidence about whether AutoCAD files are, in fact, easier to manipulate than handwritten files. Lack testified that "[i]t's easier to make changes to a floorplan in handwritten form, in a hand sketch, than it is on the AutoCAD. I know that sounds backwards, but it's actually easier to make changes in a hand sketch than it is on the AutoCAD system until you get down toward the end of the plans." Hunn, on the other hand, testified: "Changes are a lot easier to make on the AutoCAD program versus hand drawing. . . . [I]f you have an architectural drawing that is done in pencil, changes require you to make a lot of erasures to clear off the old and then update the new, and you have to

---

[6] The fact that layers permit a user to *view* the plans differently does not change the substance of what is being viewed, just as using a magnifying glass to read fine print does not change the substance of what is printed.

coordinate that with all the other drawings. So you really have to manipulate hand drawings extensively to get the final product you want." In light of the conflicting testimony, as well as the district court's credibility determinations, we cannot say that the district court clearly erred in its finding that the virtual files contained the same information as the paper files, and that Lack did not disclose confidential information when he shared the AutoCAD plans with Wilson, who already possessed the same plans in physical form.

Because Lack did not violate any fiduciary duty, Wilson could not have knowingly participated in Lack's breach of fiduciary duty.[7] Accordingly, the district court properly ruled in favor of Lack on Count IV of Hunn's complaint.

## C.

Hunn contends that Lack violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by using his work computer to transfer the AutoCAD files to his home computer with the intent of using those files for his personal benefit. The district court granted summary judgment to Lack on this claim, and we find no error. As an initial matter, Hunn never explains which subsection of § 1030 he alleges Lack violated. *Compare, e.g.*, § 1030(a)(2)(C) ("Whoever intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer . . . ."), *with* § 1030(a)(4) ("Whoever[,] knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of

---

[7] The claims against Dan Wilson and Dan Wilson Homes fail for an additional, independent reason. Those claims turn on the existence of a covert agreement between Lack and Wilson for Lack to terminate his employment with Hunn and to compete against Hunn while working for Wilson. However, as we have explained, the district court explicitly found that "Lack did not collude, plan, conspire, or otherwise secretively further an undertaking with Wilson to leave Hunn's employment and become an employee of Dan Wilson Homes . . . ." As noted above, this finding was not clearly erroneous.

value . . . .").  In any event, Hunn's claim necessarily fails because Lack did not "exceed[] authorized access" to Hunn's computers.  Hunn concedes that Lack, while employed by Hunn, had permission to send AutoCAD files to his home computer and to work on plans while at home.  When Lack sent the AutoCAD files to his friend for conversion to the 2006 version of AutoCAD, Lack was still employed by Hunn and, according to the district court, was "still under the impression that he would be allowed to continue working at Hunn Designs on the projects he had been assigned."[8]  In addition, the district court found that Lack's "intentions in converting the files on October 9 were not for the purpose of leaving his employment with Hunn."   These findings were not clearly erroneous.  *See Orduna*, 913 F.2d at 1154 ("The credibility determination of witnesses . . . is peculiarly within the province of the district court.").  Thus, because Lack did not exceed authorized access, he did not violate the Computer Fraud and Abuse Act.

**D.**

Hunn alleged that Lack violated a non-compete clause in Lack's at-will employment agreement.  The non-compete clause provides:

> In the event you leave or are separated from Hunn Designs' employment, you agree not to solicit, either directly or indirectly, business from, or undertake with any customers serviced by you while in the employ of Hunn Designs, or any other Hunn Designs' customers for a period of two years thereafter.

According to Hunn, Lack violated this clause when he agreed to complete the plans for Wilson.  The district court granted summary judgment to Lack on this claim because, in the district court's view, the non-compete clause was unenforceable.  "The enforceability of a covenant not to compete is a question

---

[8] There is no allegation that Lack accessed Hunn's computers after Lack's employment with Hunn ended.

15

of law," *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009), and we review the district court's summary judgment ruling *de novo*, *see Arete Partners*, 594 F.3d at 394.

The enforceability of non-compete clauses is governed by the Texas Covenants Not to Compete Act. *See Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011) ("Covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the Act."). In relevant part, the Act provides that "a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made." Tex. Bus. & Com. Code § 15.50(a).

The requirement of an "otherwise enforceable agreement" is satisfied when the covenant is ancillary to or part of an agreement which contains mutual, nonillusory promises. *Marsh*, 354 S.W.3d at 773. "The covenant cannot be a stand-alone promise from the employee lacking any new consideration from the employer." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). A contract for at-will employment, standing alone, does not satisfy the requirement of an "otherwise enforceable agreement" because the promise of continued employment in an at-will contract is illusory—neither the employer or employee is bound in any way. *See Fielding*, 289 S.W.3d at 849. Because Lack was an at-will employee, the employment agreement itself does not constitute an "otherwise enforceable agreement."

Hunn attempts to avoid this result by relying on a line of Texas cases holding that an employer's promise to provide an employee with confidential information, paired with an employee's promise not to disclose that confidential information, may serve as an "enforceable agreement" supporting

16

a non-compete covenant.    This principle has been the subject of numerous recent Texas Supreme Court opinions, which we briefly will summarize here.

In *Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 644 (Tex. 1994), *abrogated by Marsh*, 354 S.W.3d 764, the Texas Supreme Court explained that an at-will employment agreement, standing alone, could not be an "otherwise enforceable agreement."    The court acknowledged that "[a]t-will employees may contract with their employers on any matter except those which would limit the ability of either employer or employee to terminate the employment at will."  *Id.*  For example, the court explained, an employee could promise "not to disclose an employer's trade secrets and other proprietary information," and the employer could promise to provide that information during the employee's employment.  *Id.* at 645 n.6.  Such a promise by the employer would initially be illusory because "the employer could fire the employee and escape the obligation to perform."  *Id.*  "If, however, the employer accepts the employee's offer by [disclosing trade secrets], a unilateral contract is created in which the employee is now bound by [his] promise."  *Id.*    However, the *Light* court suggested that such an agreement still *would not* support a non-compete covenant because it would not be "an 'otherwise enforceable agreement *at the time the agreement is made'* as required by § 15.50."  *Id.* (emphasis added) (quoting Tex. Bus. & Comm. Code § 15.50(a)).

*Alex Sheshunoff*, 209 S.W.3d 644, presented the very situation about which the *Light* court hypothesized.  In *Alex Sheshunoff*, the Texas Supreme Court reaffirmed "*Light*'s recitation of basic contract law in footnote six that '[i]f only one promise is illusory, a unilateral contract can still be formed; the non-illusory promise can serve as an offer, which the promisor who made the illusory promise can accept by performance.'"  *Id.* at 650 (alteration in original) (quoting *Light*, 883 S.W.2d at 645 n.6).  However, the court departed from *Light*'s dictum "that a unilateral contract can never meet the requirements of

the Act because such a contract is not immediately enforceable when made."
*Id.* at 651. Instead, the court held that the "covenant need only be 'ancillary to
or part of' the agreement at the time the agreement is made. Accordingly, a
unilateral contract formed when the employer performs a promise that was
illusory when made can satisfy the requirements of the Act." *Id.* at 651
(quoting § 15.50(a)). Because the employer had explicitly promised to provide
the employee with confidential information, the employee had explicitly
promised not to disclose the confidential information, and the employer
actually had provided the employee with the confidential information, *id.* at
647, the non-compete covenant was ancillary to an "otherwise enforceable
agreement."

In *Fielding*, 289 S.W.3d 844, the Texas Supreme Court again addressed
the enforceability of non-compete covenants. In *Fielding*, like in *Sheshunoff*,
the employee expressly promised not to disclose any confidential information.
*Id.* at 850. However, unlike in *Sheshunoff*, the employer never expressly
promised to provide the employee with confidential information. *Id.* The
Texas Supreme Court held that the lack of an express promise by the employer
was not determinative; rather, it held that "[w]hen the nature of the work the
employee is hired to perform requires confidential information to be provided,
. . . the employer impliedly promises confidential information will be provided."
*Id.* Or, put differently, "when it is clear that performance *expressly promised
by one party* is such that it cannot be accomplished until a second party has
first performed, the law will deem the second party to have impliedly promised
to perform the necessary action." *Id.* at 851 (emphasis added). Applying this
rule to the facts of the case, the court held that the non-compete covenant was
enforceable because the employee promised not to disclose confidential
information and his work as a certified public accountant "necessarily involved
the provision of confidential information by [his employer]." *Id.* Accordingly,

18

"the parties . . . formed an 'otherwise enforceable agreement' as contemplated by section 15.50 when [the employer] performed its illusory [and implied] promise by actually providing confidential information."[9]

Hunn can find no refuge in this line of cases because neither he nor Lack made an express promise regarding confidential information.  As the district court aptly recognized:

> Here, neither the employer, Hunn, expressly promised to provide confidential information, nor did Lack, the employee, expressly promise not to disclose confidential information.  This very important distinction cannot be missed.  The rulings in the two cases relied upon by Hunn, as just discussed, clearly had one party or the other making express promises regarding confidential information, thereby implying a contract to the other party.  Here, that clearly did not occur.

The employment agreement is devoid of any reference to the topic of confidential information; thus, *Fielding*'s holding—that when an employee expressly promises not to disclose confidential information, an employer impliedly promises to provide that confidential information—is inapposite here.  Lack never expressly promised not to disclose confidential information, so there was no corresponding implied promise to provide confidential information—and therefore, there was no agreement regarding confidential information.  In the absence of such an agreement, the non-compete covenant fails because there was no "otherwise enforceable agreement" to which it was connected.

---

[9] Yet another case in this series, *Marsh USA Inc. v. Cook*, 354 S.W.3d 764 (Tex. 2011), adopted an expansive definition of the statutory phrase "ancillary to or part of," overruling the narrow definition that was given to that phrase in *Light v. Centel Cellular Co. of Texas*, 883 S.W.2d 642 (Tex. 1994).  Here, we need not reach the question of whether the non-compete covenant satisfies the "ancillary to or part of" requirement, nor do we need to consider whether Hunn actually provided Lack with access to confidential information.

In response to this point, Hunn argues that a promise not to disclose confidential information would have been "redundant and unnecessary because, as a matter of state law, . . . Lack had that obligation *without* a written contract or express promise." This argument is a non-starter. The question is not whether Lack had a duty, enforceable in tort, not to disclose confidential information. The question is whether the parties entered into an enforceable *contract* to which the non-compete covenant was ancillary. Absent such a *contract*, the non-compete agreement was not ancillary to any "otherwise enforceable agreement" and is thus invalid. Accordingly, the district court appropriately granted summary judgment to Lack.

### E.

Hunn further alleged that Appellees, by using the four plans to complete the houses, infringed the copyrights Hunn obtained on the partial plans Lack had drawn while still employed by Hunn. "To prevail on a copyright infringement claim, a plaintiff must show (1) ownership of a valid copyright and (2) unauthorized copying." *Peel & Co., Inc. v. Rug Mkt.*, 238 F.3d 391, 394 (5th Cir. 2001). "The existence of a license authorizing the use of copyrighted material is an affirmative defense to an allegation of infringement." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) (internal quotation marks omitted).

After trial, the district court ruled in favor of Appellees on this claim because it found that "[a]n implied license existed for the use of the draft plans at issue." According to the district court, "[a]s was often the industry practice in the Lubbock area by home builders and draftsmen or architects, the intent of the parties here was to grant an implied license for the use of . . . the plans later copyrighted by Hunn to build the Winder/McGee, Jeffers, Brown, and

Showcase homes."[10]  The district court based its conclusion, in part, on the fact that the homeowners themselves "essentially came up with their design ideas and sought to have those self-designed homes built [after their ideas were] placed into the drafting stage. . . .  Under Hunn's theory of the case, he had the power to stop the homeowners from building their self-designed dream homes based on his assertions to Wilson of copyright."[11]

On appeal, Hunn argues that the district court erred in finding the existence of an implied license.  Hunn asserts that "[n]o known prior case has concluded that a license results from the delivery of drafts" and that the district court's "conclusion of the existence of an implied license was clearly erroneous."  Contrary to Hunn's assertion, several cases have found implied licenses in circumstances similar to those in this case.  For example, in *I.A.E., Inc. v. Shaver*, 74 F.3d 768 (7th Cir. 1996), an architect named Shaver prepared and delivered a preliminary design for an airport project.  *Id.* at 771.  After receiving the preliminary design, the contractor elected to hire another architect to complete the design.  *Id.*  Shaver sued, claiming, among other things, that he had not granted the airport a license to use his drawings "in any way that it wished," but rather only to use the drawings in completing the project with Shaver as the architect.  *Id.* at 773.  The Seventh Circuit affirmed summary judgment against Shaver because "Shaver created an implied

[10] The district court also stated: "Hunn Designs' conduct and practice of allowing Lack to take copies of the updated plans each week to the homeowners and Wilson demonstrate an agreed understanding between Wilson and Hunn of a continuing license to use the home plans to build the homes for which they were created."

[11] In the alternative, the district court found that three copyrighted plans were not "substantially similar" to the plans used to build the Winder/McGee, Jeffers, and Showcase homes, and that Wilson had his own copyright on the plans for the Green home.  Accordingly, the district court ruled that even if there was no license, there still was no infringement.  In light of our determination that Wilson had an implied license to use the copyrighted plans, we need not review the district court's determination that the plans were not "substantially similar."

nonexclusive license to use his schematic design drawings in the Airport Project," and his "contention that he never intended to grant a license for the use of his drawings past the drafting stage unless he was the continuing architect is simply not supported by the record." *Id.* at 777–78. Likewise, Hunn created an implied nonexclusive license when he delivered (through his agent, Lack) plans for the four custom homes without any "written or orally communicated restrictions about limits on Dan Wilson's ability to use the delivered drawings." *Cf. Effects Associates, Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) ("[Plaintiff] created a work at defendant's request and handed it over, intending that defendant copy and distribute it. . . . Accordingly, we conclude that [Plaintiff] impliedly granted nonexclusive licenses to [Defendant] . . . .").

Hunn next argues that, even if he granted a license to Wilson to use the draft plans, he did not grant a license for Wilson to use the plans in the AutoCAD format. This argument fails for at least two reasons. First, as we have explained, the AutoCAD files contained the same plans as the physical files for which Wilson had an implied license. Second, Hunn did not copyright the AutoCAD files; he copyrighted plans that he printed out from the AutoCAD program.[12] Thus, the plans for which he received copyrights were identical— in *both* substance and form—to the plans that Wilson already had in his possession and for which he had an implied license. Accordingly, we find no reversible error with respect to the copyright claim.

---

[12] At trial, the following exchange took place during re-cross-examination of Hunn:
> **Counsel for Wilson:** You didn't actually sen[d] the AutoCAD program up to the copyright office and say, "Copyright, this is electronic data," did you?
> **Hunn:** No.
> **Counsel for Wilson:** You just hit "Print," and that's what came out of it?
> **Hunn:** [Yes].

22

**F.**

Hunn alleged that all Appellees violated the Lanham Act, 15 U.S.C. § 1125(a), which prohibits, *inter alia*, "false designations of origin" that are "likely to cause confusion."  Hunn pursued this claim as a "reverse passing off" claim, meaning that Hunn alleged that Appellees were passing off Hunn's product as their own.  *See Johnson v. Jones*, 149 F.3d 494, 504 (6th Cir. 1998) ("[T]he typical case of deliberate 'passing off' involves a defendant's passing off his own product as that of the plaintiff.  This, however, is the quintessential 'reverse passing off'; here, the defendant is deliberately passing off the plaintiff's product as his own.").  Hunn's claim is based on his allegation that Wilson submitted the finished plans to the City of Lubbock without any statement on the plans indicating that portions of the work were completed during Lack's employment with Hunn.

In the district court, Hunn argued that the elements of a Lanham Act claim for false designation of origin are: "(1) the false designation *must have a substantial economic effect on interstate commerce*; and (2) the false designation must create a likelihood of confusion." (Emphasis added).  The district court granted summary judgment for defendants on this claim because Hunn did not submit any summary judgment evidence that the drawings submitted to the City of Lubbock had a "substantial economic effect on interstate commerce."

On appeal, Hunn changes his tune and argues that "15 U.S.C. § 1125 does not require a 'substantial effect' on commerce."  We highly doubt that Hunn may raise this argument on appeal, given that he advanced the contrary argument in the district court.  But even assuming arguendo that he can, he is incorrect; the statute does require that the allegedly false designation enter into and/or have an effect on interstate commerce.  *See, e.g.*, *King v. Ames*, 179 F.3d 370, 373–74 (5th Cir. 1999) ("Persons bringing an action pursuant to this

provision must demonstrate that . . . the defendants caused their products to enter interstate commerce . . . ."); *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990) (noting that a "reverse palming off" claim requires proof of "a use of false designation of origin and false representation in interstate commerce"). Hunn does not cite to any evidence in the record that these plans—which were created by Lubbock businesses to build homes in Lubbock and were submitted to the City of Lubbock—affected or entered into interstate commerce. Accordingly, the district court correctly determined that Hunn's Lanham Act claim fails.

### G.

Finally, Hunn appeals from the district court's award of attorney's fees to Wilson and Lack for prevailing in their defense against a copyright infringement claim. *See* 17 U.S.C. § 505; *see also Galiano v. Harrah's Operating Co.*, 416 F.3d 411, 422–23 (5th Cir. 2005) ("The Copyright Act provides that 'in its discretion' a district court may 'award a reasonable attorney's fee to the prevailing party as part of the costs.'" (quoting 17 U.S.C. § 505)). We review a district court's award of attorney's fees under the Copyright Act for abuse of discretion. *Galiano*, 416 F.3d at 423.

"[A]n award of attorney's fees to the prevailing party in a copyright action is the rule rather than the exception and should be awarded routinely." *Virgin Records Am., Inc. v. Thompson*, 512 F.3d 724, 726 (5th Cir. 2008) (internal quotation marks omitted). In *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 534–35 (1994), the Supreme Court listed several non-exclusive factors that a court *may* consider in exercising its discretion: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." 510 U.S. at 534 n.19 (internal quotation marks omitted). Although these factors are useful, we have "rejected the idea

that district courts are bound to apply verbatim the factors listed [in *Fogerty*]." *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 412 (5th Cir. 2004). Indeed, we have affirmed an award of attorney's fees where, as here, the district court applied the factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), instead of the factors from *Fogerty*.  *See Hogan Sys., Inc. v. Cybresource Int'l, Inc.*, 158 F.3d 319, 325 (5th Cir. 1998).

We find no abuse of discretion in this case.  The district court's order regarding attorney's fees is materially identical to the district court's order in *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 578 (5th Cir. 2003), in which we upheld a fee award and stated: "The court cited and, we are confident, applied the relevant authorities, and it explicitly stated that its award promotes the purposes of the Copyright Act and is reasonable."  Although the district court in this case did not explicitly state that the award "promotes the purposes of the Copyright Act," its extensive analysis of the copyright issues in its findings of fact and conclusions of law make clear that it considered the parties' motivations, reasonableness, and the need to advance considerations of compensation and deterrence.  Moreover, in our judgment, "there were sufficient grounds supporting the district court's exercise of its discretion to award attorneys' fees."  *Hogan*, 158 F.3d at 326.  Because the district court cited and applied the relevant authorities, and because Hunn has "offered nothing on appeal to compel a conclusion that the district court abused its discretion," *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 817 (5th Cir. 1997), the district court did not abuse its discretion by awarding attorney's fees.

AFFIRMED.